[No. S048739. Dec. 19, 1996.]

TIDEWATER MARINE WESTERN, INC., et al., Plaintiffs and
Respondents, v.
VICTORIA L. BRADSHAW, as Labor Commissioner, etc., et al.,
Defendants and Appellants.

## COUNSEL

Daniel E. Lungren, Attorney General, Edmond B. Mamer, Carol H. Rehm. Jr., and David S. Chaney, Deputy Attorneys General, H. Thomas Cadell, Jr., Michael S. Villeneuve, William A. Reich, Miles E. Locker, Anticouni & Anticouni, Anticouni & Associates, Bruce N. Anticouni, Curtis Heeter, Henry Bongiovi and Caroline M. Weeks for Defendants and Appellants.

Michael Asimow as Amicus Curiae on behalf of Defendants and Appellants.

Baker & Hostetler, Michael M. Johnson, Ralph Zarefsky and Lisa F. Hinchliffe for Plaintiffs and Respondents.

Laurie A. Frost, Carlsmith, Ball, Wichman, Case & Ichiki, Barry R. Ogilby, Musick, Peeler & Garrett and Charles E. Slyngstad as Amici Curiae on behalf of Plaintiffs and Respondents.

## OPINION

CHIN, J.—In this case, we decide whether the wage orders of the Industrial Welfare Commission (IWC) govern employment in the Santa Barbara Channel. To decide that question, we must decide, among other things, whether written interpretive policies of the state agency charged with enforcing IWC wage orders constitute regulations within the meaning of the Administrative Procedure Act (APA) (Gov. Code, § 11340 et seq.). We conclude that these interpretive policies do constitute regulations and therefore are void because they were not adopted in accordance with the APA. Nevertheless, we conclude that the agency properly exercised its enforcement jurisdiction and that the trial court erred in granting a permanent injunction barring enforcement. Accordingly, we affirm the judgment of the Court of Appeal.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs Tidewater Marine Western, Inc. (Tidewater), and Zapata Gulf Pacific, Inc. (Zapata), are maritime firms that transport (or transported) workers and supplies from the California coast to oil-drilling platforms located in the Santa Barbara Channel. Plaintiff Offshore Marine Service Association (OMSA) is a trade association representing the owners and operators of vessels engaged in offshore marine services. The crew members who work for Tidewater and Zapata in the Santa Barbara Channel reside in California. They are on duty 12 hours during a 24-hour period, but the demands of work are inconstant, and crew members may spend part of this duty period engaged in leisure activities. Zapata and Tidewater compensate their crew members at a flat daily rate of pay without special compensation for "overtime."

Defendant IWC is the state agency empowered to formulate regulations (known as wage orders) governing employment in the State of California. (Lab. Code, §§ 1173, 1178.5, 1182.) Defendant Division of Labor Standards Enforcement (DLSE), headed by defendant Victoria L. Bradshaw, as Labor Commissioner, is the state agency empowered to enforce California's labor

laws, including IWC wage orders. (Lab. Code, §§ 21, 61, 95, 98-98.7, 1193.5.) IWC wage order No. 4-89 governs employees "in professional, *technical,* clerical, *mechanical,* and similar occupations . . . unless such occupation is performed in an industry covered by an industry order of this Commission." (Cal. Code Regs., tit. 8, § 11040, subd. 1, italics added.) IWC wage order No. 9-90 governs employees in the transportation industry, which includes "any industry, business, or establishment operated for the purpose of conveying persons or property from one place to another whether by rail, highway, air, or *water,* and all operations and services in connection therewith . . . ." (Cal. Code Regs., tit. 8, § 11090, subd. 2(C), italics added.) Wage orders Nos. 4-89 and 9-90 both bar work in excess of eight hours in any twenty-four-hour period unless the employer pays "overtime," which is generally "[o]ne and one-half (1 1/2) times the employee's regular rate of pay," increasing to "[d]ouble the employee's regular rate of pay for all hours worked in excess of twelve (12) hours." (Cal. Code Regs., tit. 8, §§ 11040, subd. 3(A)(1), (2), 11090, subd. 3(A)(1), (2).)

Starting about 1978, employees in the maritime industry began filing claims with the DLSE. The DLSE determined on a case-by-case basis whether state labor laws applied to these employees, considering such factors as the type of vessel, the nature of its activities, how far it traveled from the California coast, how long it was at sea, and whether it left from and returned to the same port. The DLSE also considered contacts, if any, between the employees and California, such as whether the employees entered into their employment contracts in California, resided in California, owned property in California, paid taxes in California, made regular purchases in California, sent their children to California schools, or spent significant time in California. The DLSE eventually replaced this case-by-case adjudication with a written enforcement policy, which provides: "IWC standards apply to crews of fishing boats, cruise boats, and similar vessels operating exclusively between California ports, or returning to the same port, if the employees in question entered into employment contracts in California and are residents of California." In the early 1980's, this written policy existed only in a draft policy manual the DLSE prepared for the guidance of deputy labor commissioners. In 1989, however, the DLSE prepared a formal "Operations and Procedures Manual" incorporating the same policy and made that manual available to the public on request. The manual reflected "an effort to organize . . . interpretive and enforcement policies" of the agency and "achieve some measure of uniformity from one office to the next." The DLSE prepared its policy manuals internally, without input from affected employers, employees, or the public generally.

In 1987, the DLSE began applying IWC wage order No. 4-80, the predecessor to wage order No. 4-89, to maritime employees working in the

Santa Barbara Channel. Various shipping associations, including OMSA, brought an action in federal court, seeking an injunction curtailing enforcement of California's labor laws, and Tidewater intervened in that action. (*Pacific Merchant Shipping Ass'n* v. *Aubry* (C.D.Cal. 1989) 709 F.Supp. 1516.) Among other things, the plaintiffs asserted that the Fair Labor Standards Act of 1938 (FLSA) (29 U.S.C. § 201 et seq.) preempted California's attempt to regulate the overtime pay of certain maritime employees. The FLSA requires employers engaged in "commerce" to pay overtime wages to their employees (29 U.S.C. § 207), but the FLSA includes an express exception for seamen. (29 U.S.C. § 213(b)(6).) This exception covers Tidewater's and Zapata's crew members. The plaintiffs asserted that the exception evidenced congressional intent to preempt state laws mandating overtime pay for seamen. The plaintiffs also argued that federal law and Coast Guard regulations provided seamen with ample protection. (See, e.g., 46 U.S.C. §§ 8101, 8104; 46 C.F.R. § 15.101 et seq. (1995).)

The federal district court issued an injunction, but the Ninth Circuit Court of Appeals reversed. (*Pacific Merchant Shipping Ass'n* v. *Aubry* (9th Cir. 1990) 918 F.2d 1409, cert. den. (1992) 504 U.S. 979 [119 L.Ed.2d 578, 112 S.Ct. 2956].) The Ninth Circuit held that federal law did not preempt the IWC wage orders governing overtime wages, but the court expressly did not decide whether the IWC wage orders were enforceable against maritime employers under state law. (918 F.2d at p. 1425.)

Starting in 1992, various employees of Tidewater and Zapata working aboard boats operating in the Santa Barbara Channel filed suits in Santa Barbara Superior Court, seeking retroactive overtime pay. Plaintiffs responded by filing this action, again asking for an injunction curtailing enforcement of the IWC wage orders governing overtime pay.

Plaintiffs argue that the Legislature did not intend the IWC's jurisdiction to extend beyond California's federal law boundaries. Plaintiffs also renew their argument that federal law preempts state law. Finally, plaintiffs assert that the provision in the DLSE's "Operations and Procedures Manual" that interprets the IWC wage orders as applying to Tidewater's and Zapata's operations in the Santa Barbara Channel is an "underground regulation" that was not issued in accordance with the APA and is therefore void.

The superior court granted an injunction barring application of IWC wage orders to Tidewater's and Zapata's employees working more than three miles off the coast, but the Court of Appeal reversed. The Court of Appeal held, among other things, that the relevant provision of the DLSE's Operations and Procedures Manual was not a regulation subject to the rulemaking

procedures of the APA, but merely an "interpretation" that "applies the wage order to a specific group of employers." We granted review, and, though we disagree with some of the Court of Appeal's reasoning, we affirm.

## II. DISCUSSION

Though the superior court's injunction covered Tidewater's and Zapata's employees working *anywhere* more than three miles from the California coast, the Court of Appeal focused on those employees who are named defendants in this action and who work in the Santa Barbara Channel. Because we are reviewing the decision of the Court of Appeal, our focus is also on Tidewater's and Zapata's operations in the Santa Barbara Channel. At issue, of course, is whether IWC wage orders apply to those operations.

### A. *Federal Law Does Not Bar California From Regulating Maritime Employment in the Santa Barbara Channel*

As an initial matter, we consider whether federal law precludes the IWC from regulating maritime employment in the Santa Barbara Channel. If it does, then we need not consider whether the IWC attempted to do so when it adopted wage orders Nos. 4-89 and 9-90.

#### 1. *California has the power to regulate employment outside its federal law boundaries*

Under state law, California's territorial boundaries extend three nautical miles beyond the outermost islands, reefs, and rocks, and include all waters between those islands and the coast. (Cal. Const., art. III, § 2; Gov. Code, §§ 170, 171; *People v. Weeren* (1980) 26 Cal.3d 654, 661 [163 Cal.Rptr. 255, 607 P.2d 1279] (*Weeren*).) Under this state law definition of California's boundaries, the entire Santa Barbara Channel is within the state. On the other hand, federal law defines California's territorial boundaries more narrowly, extending three nautical miles from the coast, and including a three-mile-wide band around any islands lying off the coast, but excluding waters between the islands and the coast. (43 U.S.C. §§ 1301(b), 1312.) Under this federal law definition of California's boundaries, the central portion of the Santa Barbara Channel is not within the state. (*United States v. California* (1965) 381 U.S. 139, 169-171 [14 L.Ed.2d 296, 313-316, 85 S.Ct. 1401].)

In defining California's federal law boundaries, Congress did not, however, suggest that California lacked power to regulate conduct outside those boundaries and within broader state law boundaries. (*Weeren, supra,* 26

Cal.3d at p. 666.) Congress adopted the statute defining California's federal law boundaries in response to the United States Supreme Court's opinion in *United States* v. *California* (1947) 332 U.S. 19 [91 L.Ed. 1889, 67 S.Ct. 1658] (supplemental opn. at 332 U.S. 804 [92 L.Ed. 382, 68 S.Ct. 20]). In that case, the State of California and the United States disputed the ownership of the land, and more significantly the minerals, adjacent to the coast and underlying the Pacific Ocean. The Supreme Court held that, with the exception of bays, all the land seaward of the low-water mark belonged to the United States. (332 U.S. at p. 805 [92 L.Ed. at p. 383].) Nevertheless, the high court expressly conceded that California is "authorized to exercise local police power functions" within the territory found to belong to the United States. (332 U.S. at p. 36 [91 L.Ed. at p. 1898].) Congress responded to the high court's decision by enacting the Submerged Lands Act (43 U.S.C. § 1301 et seq.), which defined California's boundaries as extending three geographical miles seaward of the low-water line, and which transferred to California ownership of the underwater lands located within its boundaries.

In *Weeren*, we considered the applicability of California's criminal laws in the territory beyond California's federal law boundaries but within its state law boundaries. We stated the federal law boundaries apply "when the extent of a state's territorial jurisdiction is relevant to the operation of federal law." (*Weeren, supra,* 26 Cal.3d at p. 660.) Thus, federal law defines "the state's 'boundaries' for *all* purposes, political and proprietary, 'as between Nation and State.' " (*Id.* at p. 663.) On the other hand, where state criminal law does not conflict with federal law, "the state boundaries as defined by our state Constitution and statutes . . . are the limits to which the Legislature implicitly intended to extend California's criminal laws . . . ." (*Id.* at p. 669.) Thus, we did not interpret the federal law boundaries as limiting the state's power to regulate conduct outside those boundaries and within broader state law boundaries. ▮ Like the criminal laws at issue in *Weeren*, California employment laws implicitly extend to employment occurring within California's *state law* boundaries, including all of the Santa Barbara Channel. The federal law boundaries would have precedence only if the operation of federal law were at issue, as for example if federal law conflicted with state law. (*Id.* at p. 670.)

Moreover, even if California had not defined (or could not define) its boundaries more broadly than does federal law, nothing precludes a state from regulating conduct beyond its borders. (*Smith* v. *United States* (1993) 507 U.S. 197, 213 [122 L.Ed.2d 548, 561-562, 113 S.Ct. 1178]; *Skiriotes* v. *Florida* (1941) 313 U.S. 69 [85 L.Ed. 1193, 61 S.Ct. 924]; *Weeren, supra,* 26 Cal.3d at p. 666.) *Skiriotes* involved a Florida law prohibiting the use of

certain diving equipment in taking commercial sponges from the Gulf of Mexico. The trial court convicted Lambiris Skiriotes of violating this law. Skiriotes argued on appeal that he used the equipment more than three miles from the coast and therefore outside Florida's boundaries as defined in certain federal treaties. Florida asserted that Skiriotes's activities were within its boundaries because, regardless of federal treaties, its boundaries extended nine nautical miles from the coast. The high court thought the dispute over Florida's boundaries irrelevant, stating: "Even if it were assumed that the *locus* of the offense was outside the territorial waters of Florida, it would not follow that the State could not prohibit its own citizens from the use of the described divers' equipment at that place." (*Skiriotes* v. *Florida, supra,* 313 U.S. at p. 76 [85 L.Ed. at p. 1200].) "[W]e see no reason why the State of Florida may not . . . govern the conduct of its citizens upon the high seas with respect to matters in which the State has a legitimate interest and where there is no conflict with acts of Congress. . . . [T]he State of Florida has retained the status of a sovereign." (*Id.* at p. 77 [85 L.Ed. at p. 1200].) Similarly, regardless of its boundaries, California can govern employment of its residents on the high seas, provided there is no conflict with federal law.

### 2. *Federal law does not conflict with or otherwise preempt state regulation of seamen's overtime pay*

In a reprise of the argument OMSA and Tidewater made to the federal courts, plaintiffs here argue that the FLSA conflicts with or otherwise preempts state regulation of the overtime pay of seamen, including Tidewater's and Zapata's employees in the Santa Barbara Channel. Of course, the Ninth Circuit's decision finding no preemption binds OMSA and Tidewater, who were parties to the federal action. (*Bernhard* v. *Bank of America* (1942) 19 Cal.2d 807 [122 P.2d 892].) Zapata does not persuade us that the Ninth Circuit's decision was wrong.

As discussed above, the FLSA requires employers engaged in "commerce" to pay overtime wages to their employees (29 U.S.C. § 207), but the FLSA includes an express exemption for seamen. (29 U.S.C. § 213(b)(6).) Zapata asserts that this exemption is not merely the absence of federal regulation under the FLSA, but an affirmative preemption of state regulation. In support of this assertion, Zapata argues that regulating the overtime of seamen would be impractical because of the variable and unpredictable nature of their workdays. Zapata also argues that general principles of federal admiralty law regulate the hours and working conditions of maritime workers, including a right to "a reasonable amount of extra wages" for

overtime. (See *Bender* v. *Waterman S. S. Corporation* (E.D.Pa. 1946) 69 F.Supp. 15, 19, affd. (3d Cir. 1948) 166 F.2d 428; *The Carrier Dove* (N.D.Wash. 1899) 98 Fed. 313, 314; *The Lakme* (N.D.Wash. 1899) 93 Fed. 230, 232.) Zapata asserts that the FLSA's exemption for seamen is part of the fabric of federal admiralty law, which, in the interest of uniformity, generally preempts state law. (See *Southern Pacific Co.* v. *Jensen* (1917) 244 U.S. 205 [61 L.Ed. 1086, 37 S.Ct. 524] [federal admiralty law preempts state workers' compensation law]; see also *Offshore Logistics, Inc.* v. *Tallentire* (1986) 477 U.S. 207 [91 L.Ed.2d 174, 106 S.Ct. 2485]; *Oil Workers* v. *Mobil Oil Corp.* (1976) 426 U.S. 407 [48 L.Ed.2d 736, 96 S.Ct. 2140]; *Knickerbocker Ice Co.* v. *Stewart* (1920) 253 U.S. 149 [64 L.Ed. 834, 40 S.Ct. 438, 11 A.L.R 1145].)

In pressing these arguments, Zapata skirts the analytical framework generally applicable to preemption questions. ▇ In determining whether federal law preempts state law, "our sole task is to ascertain the intent of Congress." (*California Federal S. & L. Assn.* v. *Guerra* (1987) 479 U.S. 272, 280 [93 L.Ed.2d 613, 623, 107 S.Ct. 683] (*Guerra*).) Moreover, this intent must be "clear and manifest." (*Rice* v. *Santa Fe Elevator Corp.* (1947) 331 U.S. 218, 230 [91 L.Ed. 1447, 1459, 67 S.Ct. 1146].) Preemption may occur in three situations: (1) where the federal law expressly so states, (2) where the federal law is so comprehensive that it leaves " 'no room' for supplementary state regulation," or (3) where the federal and state laws "actually conflict[]." (*Guerra, supra,* 479 U.S. at pp. 280-281 [93 L.Ed.2d at p. 623].)

▇ Here, not only does the FLSA leave "room" for supplementary state regulation of overtime, the FLSA expressly indicates that it does *not* preempt this regulation. The FLSA includes a "savings clause," which provides: "No provision of this chapter or of any order thereunder shall excuse noncompliance with any . . . State law or municipal ordinance establishing . . . a maximum workweek lower than the maximum workweek established under this chapter . . . ." (29 U.S.C. § 218(a).) The federal courts that have addressed this question have interpreted this savings clause as expressly permitting states to regulate overtime wages. (See, e.g., *Overnite Transp. Co.* v. *Tianti* (2d Cir. 1991) 926 F.2d 220, 222 ["state overtime wage law is not preempted by . . . the FLSA"]; *Pacific Merchant Shipping Ass'n* v. *Aubry, supra,* 918 F.2d at p. 1422 ["Congress has specifically allowed states to enforce overtime laws more generous than the FLSA," citing the savings clause]; *Pettis Moving Co., Inc.* v. *Roberts* (2d Cir. 1986) 784 F.2d 439, 441 [savings clause "explicitly permits states to set more stringent overtime provisions than the FLSA"]; and *Williams* v. *W. M. A. Transit Company* (D.C. Cir. 1972) 472 F.2d 1258, 1261 [153 App.D.C. 183] [savings clause "permits state laws to operate even as to workers exempt from FLSA"].)

Moreover, no provision of the FLSA "actually conflicts" with California law. The FLSA does not expressly preclude states from regulating the overtime wages of seamen, and the legislative history of the FLSA does not suggest an implicit preclusion. The legislative history indicates that Congress added the exemption for seamen at the request of labor unions representing seamen. The unions were concerned that regulating the employment of seamen under the FLSA would conflict with other federal laws protecting seamen. (29 C.F.R. § 783.29 (1996) [describing legislative history of the FLSA's seaman exemption].) Thus, the seamen exemption appears to have had no purpose other than to negate the regulatory effect the FLSA would otherwise have had on the employment of seamen, not to create an affirmative bar against state regulation of that employment. In sum, we find no evidence that Congress intended the FLSA's seamen exemption to preempt state law.

Having determined that federal law permits California to regulate maritime employment in the Santa Barbara Channel, we next consider whether California exercised this power by way of IWC wage orders Nos. 4-89 and 9-90. ■ Of course, the DLSE's Operations and Procedures Manual addresses this question, and we must "accord[] great weight and respect" to a valid administrative construction of a controlling statute or regulation. (*International Business Machines* v. *State Bd. of Equalization* (1980) 26 Cal.3d 923, 931, fn. 7 [163 Cal.Rptr. 782, 609 P.2d 1].) Thus, before construing the applicable legal provisions on our own, we must determine whether the DLSE's construction of those provisions is valid and therefore entitled to deference.

B. *The DLSE's Policy for Determining Whether IWC Wage Orders Apply to Maritime Employers Is Void for Failure to Follow the APA*

The APA establishes the procedures by which state agencies may adopt regulations. The agency must give the public notice of its proposed regulatory action (Gov. Code, §§ 11346.4, 11346.5); issue a complete text of the proposed regulation with a statement of the reasons for it (Gov. Code, § 11346.2, subds. (a), (b)); give interested parties an opportunity to comment on the proposed regulation (Gov. Code, § 11346.8); respond in writing to public comments (Gov. Code, §§ 11346.8, subd. (a), 11346.9); and forward a file of all materials on which the agency relied in the regulatory process to the Office of Administrative Law (Gov. Code, § 11347.3, subd. (b)), which reviews the regulation for consistency with the law, clarity, and necessity (Gov. Code, §§ 11349.1, 11349.3).

■ One purpose of the APA is to ensure that those persons or entities whom a regulation will affect have a voice in its creation (*Armistead* v. *State*

*Personnel Board* (1978) 22 Cal.3d 198, 204-205 [149 Cal.Rptr. 1, 583 P.2d 744] (*Armistead*)), as well as notice of the law's requirements so that they can conform their conduct accordingly (*Ligon* v. *State Personnel Bd.* (1981) 123 Cal.App.3d 583, 588 [176 Cal.Rptr. 717] (*Ligon*)). The Legislature wisely perceived that the party subject to regulation is often in the best position, and has the greatest incentive, to inform the agency about possible unintended consequences of a proposed regulation. Moreover, public participation in the regulatory process directs the attention of agency policymakers to the public they serve, thus providing some security against bureaucratic tyranny. (See *San Diego Nursery Co.* v. *Agricultural Labor Relations Bd.* (1979) 100 Cal.App.3d 128, 142-143 [160 Cal.Rptr. 822].)

The Labor Code includes regulatory procedures analogous to those in the APA, but applicable only to the IWC. For example, the IWC must hold a public hearing when it investigates the adequacy of wages or employment conditions in a given industry. (Lab. Code, § 1178.) It must then select a wage board composed equally of employer and employee representatives and designate a nonvoting chairperson. The wage board reports a recommendation (Lab. Code, § 1178.5, subds. (a), (b)), and after the IWC receives that report, it prepares proposed regulations. In most cases, the IWC must hold a public hearing in three cities in the state. (Lab. Code, § 1178.5, subd. (c).) The IWC must give notice of these public hearings by advertising in newspapers throughout the state and mailing notice "to each association of employers or employees which, in the opinion of the commission, would be affected by the hearing." (Lab. Code, § 1181, subds. (a), (b).) The IWC must also publish any action that it takes in newspapers throughout the state (Lab. Code, § 1182.1) and mail copies of new regulations to affected employers (Lab. Code, § 1183). Any aggrieved person may apply within 20 days for a rehearing. (Lab. Code, § 1188.) Finally, the public has a right to petition the IWC to adopt new regulations. (Lab. Code, §§ 1176.1, 1176.3.)

In light of these comprehensive procedural protections applicable to IWC rulemaking, the Legislature no doubt concluded that compliance with the APA would be largely redundant and might create confusion as to which procedures applied in a particular circumstance. Thus, the Legislature provided that IWC regulations promulgated in accordance with the Labor Code are "valid and operative" and expressly exempted from the APA. (Lab. Code, § 1185.)

The DLSE's primary function is enforcement, not rulemaking. (Lab. Code, §§ 61, 95, 98-98.7, 1193.5.) Nevertheless, recognizing that enforcement requires some interpretation and that these interpretations should be

uniform and available to the public, the Legislature empowered the DLSE to promulgate necessary "regulations and rules of practice and procedure." (Lab. Code, § 98.8.) The Labor Code does not, however, include special rulemaking procedures for the DLSE similar to those that govern IWC rulemaking, nor does it expressly exempt the DLSE from the APA. ▪ At issue in this litigation is whether the Legislature intended to make the DLSE's regulations subject to the APA, and if it did, whether the DLSE policy at issue here constitutes a regulation.

The APA provides that "[n]o *state agency* shall issue, utilize, enforce, or attempt to enforce any guideline, criterion, bulletin, manual, instruction, order, standard of general application, or other rule, which is a regulation . . . , unless the guideline, criterion, bulletin, manual, instruction, order, standard of general application, or other rule has been adopted as a regulation and filed with the Secretary of State pursuant to this chapter." (Gov. Code, § 11340.5, subd. (a), italics added.) The APA applies "to the exercise of *any quasi-legislative power* conferred by *any statute* heretofore or hereafter enacted," and the APA's provisions "shall not be superseded or modified by any subsequent legislation except to the extent that the legislation shall do so expressly." (Gov. Code, § 11346, italics added.) These broad statements of scope suggest the APA applies to the DLSE.

Defendants argue that applying the APA to the DLSE's interpretations of IWC wage orders would undermine the IWC's exemption from the APA. For example, the DLSE argues: "Clearly, in deliberately excluding the wage order promulgation process from the procedures and oversight of the APA, the Legislature could not have intended the very wage orders it had specifically excluded from the APA to be rescreened and examined under the APA when interpreted." Of course, the wage order is not "rescreened and examined under the APA"; rather, the DLSE's policy interpreting the wage order is so examined. Moreover, the Legislature created comprehensive rulemaking procedures that apply to the IWC in lieu of the APA. No such procedures apply to the DLSE.

The APA provides that "[n]o *state agency* shall issue, utilize, enforce, or attempt to enforce . . . a regulation" without complying with the APA's notice and comment provisions. (Gov. Code, § 11340.5, subd. (a), italics added.) The exception that covers the IWC is expressly limited to the IWC and makes specific reference to the comprehensive rulemaking procedures that apply to the IWC. (Lab. Code, § 1185.) In the absence of textual support or some other persuasive indication of legislative intent, we will not assume the Legislature intended the DLSE to adopt regulations without any public

participation or procedural safeguards. Thus, we find no basis for exempting the DLSE from the requirements of the APA.

Defendants argue the DLSE policy at issue here is not a regulation subject to the APA. The APA, however, defines "regulation" very broadly to include "every rule, regulation, order, or standard of general application or the amendment, supplement, or revision of any rule, regulation, order, or standard adopted by any state agency to implement, interpret, or make specific the law enforced or administered by it, or to govern its procedure, except one that relates only to the internal management of the state agency." (Gov. Code, § 11342, subd. (g).) ■ A regulation subject to the APA thus has two principal identifying characteristics. (See *Union of American Physicians & Dentists* v. *Kizer* (1990) 223 Cal.App.3d 490, 497 [272 Cal.Rptr. 886] [describing two-part test of the Office of Administrative Law].) First, the agency must intend its rule to apply generally, rather than in a specific case. The rule need not, however, apply universally; a rule applies generally so long as it declares how a certain class of cases will be decided. (*Roth* v. *Department of Veterans Affairs* (1980) 110 Cal.App.3d 622, 630 [167 Cal.Rptr. 552].) Second, the rule must "implement, interpret, or make specific the law enforced or administered by [the agency], or . . . govern [the agency's] procedure." (Gov. Code, § 11342, subd. (g).)

Of course, interpretations that arise in the course of case-specific adjudication are not regulations, though they may be persuasive as precedents in similar subsequent cases. (*Bendix Forest Products Corp.* v. *Division of Occupational Saf. & Health* (1979) 25 Cal.3d 465, 471 [158 Cal.Rptr. 882, 600 P.2d 1339]; *Carmona* v. *Division of Industrial Safety* (1975) 13 Cal.3d 303, 309-310 [118 Cal.Rptr. 473, 530 P.2d 161]; *Taye* v. *Coye* (1994) 29 Cal.App.4th 1339, 1345 [35 Cal.Rptr.2d 27]; *Aguilar* v. *Association for Retarded Citizens* (1991) 234 Cal.App.3d 21, 28 [285 Cal.Rptr. 515] (*Aguilar*).) Similarly, agencies may provide private parties with advice letters, which are not subject to the rulemaking provisions of the APA. (Gov. Code, §§ 11343, subd. (a)(3), 11346.1, subd. (a).) Thus, if an agency prepares a policy manual that is no more than a restatement or summary, without commentary, of the agency's prior decisions in specific cases and its prior advice letters, the agency is not adopting regulations. (Cf. Lab. Code, § 1198.4 [implying that some "enforcement policy statements or interpretations" are not subject to the notice provisions of the APA].) A policy manual of this kind would of course be no more binding on the agency in subsequent agency proceedings or on the courts when reviewing agency proceedings than are the decisions and advice letters that it summarizes.

Examples of policies that courts have held to be regulations subject to the rulemaking procedures of the APA include: (1) an informational "bulletin"

defining terms of art and establishing a rebuttable presumption (*Union of American Physicians & Dentists* v. *Kizer, supra*, 223 Cal.App.3d at p. 501); (2) a "policy of choosing the most closely related classification" for determining prevailing wages for unclassified workers (*Division of Lab. Stds. Enforcement* v. *Ericsson Information Systems, Inc.* (1990) 221 Cal.App.3d 114, 128 [270 Cal.Rptr. 75]); and (3) a policy memorandum declaring that work performed outside one's job classification does not count toward qualifying for a promotion (*Ligon, supra*, 123 Cal.App.3d at p. 588). In contrast, examples of policies that courts have held not to be regulations include: (1) a Department of Justice checklist that officers use when administering an intoxilyzer test (*People* v. *French* (1978) 77 Cal.App.3d 511, 519 [143 Cal.Rptr. 782]); (2) the determination whether in a particular case an employer must pay employees whom it requires to be on its premises and on call, but whom it permits to sleep (*Aguilar, supra*, 234 Cal.App.3d at pp. 25-28); (3) a contractual pooling procedure whereby construction tax revenues are allocated among a county and its cities in the same ratio as sales tax revenues (*City of San Joaquin* v. *State Bd. of Equalization* (1970) 9 Cal.App.3d 365, 375 [88 Cal.Rptr. 12]); and (4) resolutions approving construction of the Richmond-San Rafael Bridge and authorizing issuance of bonds (*Faulkner* v. *Cal. Toll Bridge Authority* (1953) 40 Cal.2d 317, 323-324 [253 P.2d 659]).

■ The policy at issue in this case was expressly intended as a rule of general application to guide deputy labor commissioners on the applicability of IWC wage orders to a particular type of employment. In addition, the policy interprets the law that the DLSE enforces by determining the scope of the IWC wage orders. Finally, the record does not establish that the policy was, either in form or substance, merely a restatement or summary of how the DLSE had applied the IWC wage orders in the past. Accordingly, the DLSE's enforcement policy appears to be a regulation within the meaning of Government Code section 11342, subdivision (g), and therefore void because the DLSE failed to follow APA procedures.

■ Defendants cite *Bono Enterprises, Inc.* v. *Bradshaw* (1995) 32 Cal.App.4th 968, 978-979 [38 Cal.Rptr.2d 549] (*Bono Enterprises*) and *Skyline Homes, Inc.* v. *Department of Industrial Relations* (1985) 165 Cal.App.3d 239, 252-253 [211 Cal.Rptr. 792] (*Skyline Homes*) in support of their assertion that the DLSE's enforcement policy is not a regulation. In *Skyline Homes*, the court considered the propriety of an employer's method of calculating overtime pay for salaried employees who worked a fluctuating workweek. The employer calculated an employee's hourly wage by dividing the employee's weekly salary by the number of hours the employee actually

worked in a particular week. Thus, if an employee with a weekly salary of $500 worked 50 hours in a particular week, the employer calculated a base hourly wage of $10 and paid an additional $5 per hour for every hour of overtime. The DLSE, on the other hand, had a written policy of calculating an employee's hourly wage by dividing the employee's weekly salary by 40 hours (regardless of how many hours the employee actually worked) and not applying any of the base salary to overtime. Thus, if we use the same example as above, the DLSE would calculate an hourly wage of $12.50 ($500 ÷ 40 hours) and require an additional $18.75 per hour for every hour of overtime.

The employer in *Skyline Homes* asserted that the DLSE's policy for calculating overtime was a regulation within the meaning of the APA and therefore void because the DLSE did not adopt it in accordance with the APA. The Court of Appeal disagreed, reasoning that the policy was merely an interpretation precedent to enforcement. (*Skyline Homes, supra,* 165 Cal.App.3d at p. 253.) The only case the Court of Appeal cited in support of its holding was *Bendix Forest Products Corp.* v. *Division of Occupational Saf. & Health, supra,* 25 Cal.3d 465, which involved the interpretation of a regulation in the context of a specific adjudication, not a blanket interpretation that the agency memorialized in a policy manual, intending to apply it in all cases of a particular class or kind.

The policy for calculating overtime pay at issue in *Skyline Homes* was a regulation within the meaning of the APA because it was a standard of general application interpreting the law the DLSE enforced and because it was not merely a restatement of prior agency decisions or advice letters. We acknowledge that the employer challenged the policy in the context of a particular adjudication, but this fact does not alter its character as a policy of general application and thus a regulation. We disapprove *Skyline Homes* to the extent that it concludes otherwise.

In *Bono Enterprises,* the employer challenged a DLSE policy that required the employer to pay its employees if they had to remain on its premises during lunch break. The DLSE's policy interpreted an IWC wage order that required employers to pay for " 'the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so.' [Citation.]" (*Bono Enterprises, supra,* 32 Cal.App.4th at p. 971.) The employer asserted, among other things, that the DLSE's policy was a regulation within the meaning of the APA and therefore void because the DLSE had not adopted it in accordance with the APA. (*Id.* at p. 978.)

The Court of Appeal disagreed, describing the policy as an interpretation of a regulation, not a new regulation, and citing *Skyline Homes, supra,* 165 Cal.App.3d 239. (*Bono Enterprises, supra,* 32 Cal.App.4th at p. 978.) The court noted that the DLSE had to have discretion to interpret the IWC regulation in particular factual contexts. (*Ibid.*) The court added that it would not declare generally invalid a policy that appeared reasonable "on its face"; instead, the court would "assume decisions are fairly made on a case-by-case basis." (*Id.* at p. 979.)

The court in *Bono Enterprises* seems not to have appreciated the thrust of the employer's argument. The issue was not the DLSE's power to interpret the IWC regulation on a case-by-case basis or the reasonableness of its interpretation. The issue was the DLSE's power to interpret the regulation in an enforcement policy of general application without following the APA. Because the DLSE's policy interpreted the wage order, applied generally to a class of similar cases, and did not merely restate or summarize the DLSE's prior decisions or advice letters, it was a regulation within the meaning of the APA. We disapprove *Bono Enterprises* to the extent that it concludes otherwise.

 Defendants also argue that the DLSE's interpretation of the IWC wage orders "is the only reasonable interpretation," and therefore it does not constitute a regulation, but rather a direct application of the law. (See *Liquid Chemical Corp.* v. *Department of Health Services* (1991) 227 Cal.App.3d 1682, 1696, 1698 [279 Cal.Rptr. 103]; cf. *Union of American Physicians & Dentists* v. *Kizer, supra,* 223 Cal.App.3d at p. 498.) We disagree. Indeed, if the DLSE's interpretation of the IWC wage orders were the only reasonable interpretation, then the DLSE would not need to state the interpretation in a policy manual in order to "achieve some measure of uniformity from one office to the next."

Professor Michael Asimow, as an amicus curiae, suggests that interpretive regulations, such as the DLSE policy at issue here, are consistent with the APA because full APA rulemaking requirements apply only "to the exercise of any *quasi-legislative* power." (Gov. Code, § 11346, italics added.) Professor Asimow argues interpretive regulations are not "quasi-legislative" because an agency does not adopt them pursuant to delegated legislative power, and they do not have the force of law. (See generally, Asimow, *California Underground Regulations* (1992) 44 Admin. L.Rev. 43.)

We disagree. A written statement of policy that an agency intends to apply generally, that is unrelated to a specific case, and that predicts how the

agency will decide future cases is essentially legislative in nature even if it merely interprets applicable law. Professor Asimow argues that interpretive regulations are nonlegislative because, though courts should give them "deference," "[c]ourts need not follow them; [and] members of the public may choose to follow them but are not legally bound to do so." (See *International Business Machines* v. *State Bd. of Equalization, supra,* 26 Cal.3d at p. 931, fn. 7 [discussing scope of review of interpretive regulations].) To the extent, however, courts must *defer* to agency interpretations found in these regulations, they are rules of law, and the public disregards them at its peril.

Moreover, even if we were to agree with Professor Asimow that the Legislature did not consider interpretive regulations to be "quasi-legislative," an agency would arguably still have to adopt these regulations in accordance with the rulemaking procedures of the APA. Government Code section 11346 states that APA rulemaking procedures apply "to the exercise of any quasi-legislative power"; however, the statute does not state the opposite, i.e., that the rulemaking procedures do *not* apply when an agency adopts rules that are *not* quasi-legislative. On the other hand, Government Code section 11340.5 makes clear that the rulemaking procedures of the APA apply to any "regulation," and the definition of regulation includes "every rule . . . adopted . . . to . . . *interpret* . . . the law . . ." (i.e., interpretive regulations). (Gov. Code, § 11342, subd. (g), italics added.) If the Legislature did not intend the APA to apply to interpretive regulations, we do not think it would have expressly included interpretive regulations in this definition. Furthermore, when the Legislature wanted to create exceptions to the formal rulemaking requirements of the APA, it did so expressly and in separate sections. (Gov. Code, §§ 11346.1, subd. (a), 11343, subds. (a), (b); see also Gov. Code, § 11351; Lab. Code, § 1185.)

Professor Asimow asserts that full APA compliance entails impractical costs and delays. The agency must devote significant resources to building an agency file that will satisfy the Office of Administrative Law. (Gov. Code, § 11347.3, subd. (b).) Among other things, the agency must establish the necessity of the proposed rule. (Gov. Code, § 11349.1.) In addition, opponents of a proposed rule may file long and complex comments, which the agency must address point by point. (Gov. Code, §§ 11346.8, subd. (a), 11346.9.) Professor Asimow argues that, because of the burden of full APA compliance, agencies do not adopt regulations. Instead, they resort to case-by-case adjudication, and they use informal oral communications to direct agency staff. Sometimes, agencies seek statutory amendments, in lieu of adopting regulations, or they simply ignore the APA, issuing and enforcing regulations without regard to its provisions.

Professor Asimow identifies serious concerns. Though too many regulations may lead to confusing, conflicting, or unduly burdensome regulatory mandates that stifle individual initiative, this effect is less pronounced in the case of interpretive regulations. The public generally benefits if agencies can easily adopt interpretive regulations because interpretive regulations clarify ambiguities in the law and ensure agency-wide uniformity. In addition, agencies cannot always respond to changing circumstances promptly if they must ask the Legislature for a statutory amendment or resort to a regulatory process fraught with delays. Finally, if an agency simply ignores the APA, it ceases to be responsive to the public, and its regulations are vulnerable to attack in the courts.

Of course, the ability of agencies to issue restatements or summaries of their prior decisions and prior advice letters mitigates these concerns to some extent. If an issue is important, then presumably it will come before the agency either in an adjudication or in a request for advice. By publicizing a summary of its decisions and advice letters, the agency can provide some guidance to the public, as well as agency staff, without the necessity of following APA rulemaking procedures. If in some circumstances agencies should also be free to adopt regulations informally and without following the APA's elaborate procedures, then the Legislature should state what those circumstances are and what lesser procedural protections are appropriate. Until it does, we decline to carve out an exception for interpretive regulations that we do not believe the language of the APA adequately supports.

Thus, we conclude that DLSE's policy for determining whether to apply IWC wage orders to maritime employees constitutes a regulation and is void for failure to comply with the APA. Defendants assert that, even if the DLSE policy is void, the interpretation the DLSE expressed in that policy is nevertheless entitled to deference because of its more than 80 years of experience. We addressed and rejected the same argument in *Armistead*, *supra*, 22 Cal.3d at page 204. "[T]o give weight to [an improperly adopted regulation] in a controversy that pits [the agency] against an individual member of exactly that class the APA sought to protect . . . would permit an agency to flout the APA by penalizing those who were entitled to notice and opportunity to be heard but received neither." (*Ibid.*) We conclude we can give no weight to the DLSE's interpretation of the wage orders. (See also *Jones* v. *Tracy School Dist.* (1980) 27 Cal.3d 99, 107 [165 Cal.Rptr. 100, 611 P.2d 441]; *City of Los Angeles* v. *Los Olivos Mobile Home Park* (1989) 213 Cal.App.3d 1427, 1433 [262 Cal.Rptr. 446].)

Nevertheless, while we do not defer to the DLSE's interpretation of the IWC wage orders, we do not necessarily reject its decision to apply the wage

orders to maritime employees working in the Santa Barbara Channel. If, when we agreed with an agency's application of a controlling law, we nevertheless rejected that application simply because the agency failed to comply with the APA, then we would undermine the legal force of the controlling law. Under such a rule, an agency could effectively repeal a controlling law simply by reiterating all its substantive provisions in improperly adopted regulations. Here, for example, if Tidewater and Zapata violate applicable IWC wage orders, they should not be immune from suit simply because the DLSE adopted an invalid policy. The DLSE's policy may be void, but the underlying wage orders are *not* void. Courts must enforce those wage orders just as they would if the DLSE had never adopted its policy. Thus, in *Armistead*, although we determined not to give weight to an agency interpretation, we nevertheless considered whether that interpretation was correct. (*Armistead, supra*, 22 Cal.3d at pp. 205-206.) We disapprove *Grier v. Kizer* (1990) 219 Cal.App.3d 422 [268 Cal.Rptr. 244] to the extent that it holds otherwise.

In conclusion, we hold that the DLSE's interpretation of the IWC wage orders is void and not entitled to any deference. Nevertheless, the question remains whether the wage orders apply to Tidewater's and Zapata's activities in the Santa Barbara Channel.

C. *IWC Wage Orders Apply to Tidewater's and Zapata's Activities in the Santa Barbara Channel*

By their terms, wage orders Nos. 4-89 and 9-90 might apply to maritime employment anywhere in the world. Plaintiffs, however, argue that California's territorial boundaries establish the limits of the IWC's and the DLSE's jurisdiction, citing Labor Code sections 1173, 1174, and 1193.5. Labor Code section 1173 imposes on the IWC the duty to ascertain information about wages, hours, and working conditions "*in this state*"; section 1174 facilitates this information-gathering process by imposing certain affirmative duties on "[e]very person employing labor *in this state*"; and section 1193.5 authorizes DLSE representatives to "[i]nvestigate and ascertain the wages of all employees, and the hours and working conditions of all employees employed in any occupation *in the state*." (Italics added.) Nothing, however, in these sections explicitly defines or limits the IWC's or the DLSE's jurisdiction.

In some circumstances, state employment law explicitly governs employment outside the state's territorial boundaries. (Lab. Code, §§ 3600.5, 5305 [California workers' compensation law applies to workers hired in California but injured out of state].) The Legislature may have similarly intended

extraterritorial enforcement of IWC wage orders in limited circumstances, such as when California residents working for a California employer travel temporarily outside the state during the course of the normal workday but return to California at the end of the day. On the other hand, the Legislature may not have intended IWC wage orders to govern out-of-state businesses employing nonresidents, though the nonresident employees enter California temporarily during the course of the workday. Thus, we are not prepared, without more thorough briefing of the issues, to hold that IWC wage orders apply to *all* employment in California, and *never* to employment outside California.

Nevertheless, California's territorial boundaries are relevant to determining whether IWC wage orders apply. The Labor Code provides that "[o]ne of the functions of the Department of Industrial Relations [which includes the IWC and the DLSE] is to foster, promote, and develop the welfare of the *wage earners of California* . . . ." (Lab. Code, § 50.5, italics added.) If an employee resides in California, receives pay in California, and works exclusively, or principally, in California, then that employee is a "wage earner of California" and presumptively enjoys the protection of IWC regulations. (Cf. *United Air Lines, Inc.* v. *Industrial Welfare Com.* (1963) 211 Cal.App.2d 729, 735, 748-749 [28 Cal.Rptr. 238] [court assumes that IWC regulations apply to persons who are domiciled in California but work principally outside the state].) Thus, because the crew members who work for Tidewater and Zapata in the Santa Barbara Channel reside in California and receive pay in California, we must determine whether their work in the Santa Barbara Channel is also in California.

Plaintiffs argue that the federal law definition of California's boundaries applies and therefore that Tidewater's and Zapata's operations in the Santa Barbara Channel are outside the state. As discussed above, the federal law definition of California's boundaries applies "when the extent of a state's territorial jurisdiction is relevant to the operation of federal law." (*Weeren, supra*, 26 Cal.3d at p. 660.) On the other hand, where state and federal law do not conflict, "the state boundaries as defined by our state Constitution and statutes . . . are the limits to which the Legislature implicitly intended to extend California's . . . laws . . . ." (*Id.* at p. 669.) Because the sole issue is the interpretation and application of IWC wage orders, which constitute state law, and because we find no conflict with federal law, we hold that California's *state law* boundaries apply, which boundaries encompass the Santa Barbara Channel.

Accordingly, the crew members who work for Tidewater and Zapata in the Santa Barbara Channel reside in California, receive pay in California,

and work in California. They are "wage earners of California" and presumptively enjoy the protections of IWC wage orders. Because we find nothing in the wage orders or the Labor Code to rebut that presumption, we hold that the wage orders apply to these employees, and the trial court erred by enjoining their application. We express no opinion as to whether the trial court can enjoin the application of IWC wage orders to crew members who work primarily outside California's state law boundaries because the Court of Appeal did not address that question.

## III. Disposition

We affirm the judgment of the Court of Appeal.

George, C. J., Mosk, J., Kennard, J., Baxter, J., Werdegar, J., and Brown, J., concurred.