Filed 12/7/20; Opinion on transfer from Supreme Court
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

|  |  |
|---|---|
| GULF OFFSHORE LOGISTICS, LLC et al.,<br><br>    Petitioners,<br><br>v.<br><br>THE SUPERIOR COURT OF VENTURA COUNTY,<br><br>    Respondent,<br><br>CLAUDE NORRIS et al.,<br><br>    Real Parties in Interest. | 2d Civil No. B298318<br>(Super. Ct. No. 56-2016-00484144-CU-OE-VTA)<br>(Ventura County)<br><br><br>OPINION ON REMAND |

      This case returns to us after the California Supreme Court directed us to reconsider our prior opinion in light of *Ward v. United Airlines, Inc.* (2020) 9 Cal.5th 732 (*Ward*) and *Oman v. Delta Air Lines, Inc.* (2020) 9 Cal.5th 762 (*Oman*).  In our prior opinion, we held Louisiana law governed the employment relationships at issue here.  After considering the Supreme Court's recent guidance on the matter, we now conclude that California law applies and that the trial court correctly denied

petitioner's motion for summary judgment. Accordingly, we deny the petition for writ of mandate.

Petitioners, Louisiana-based employers Gulf Offshore Logistics, LLC and JNB Operating, LLC, employed real parties in interest, non-California residents, to work as crew members on a vessel that provided maintenance services to offshore oil platforms. The vessel was docked at a California port and sailed through California waters to the platforms, which are located outside the state's boundaries.

Crew members alleged that petitioners violated numerous provisions of California's wage and hour laws, including those relating to minimum wage and overtime, providing meal and rest periods, maintaining accurate work records and providing complete wage statements. Petitioners moved for summary judgment on the theories that Louisiana rather than California law governed these employment relationships and that the federal Fair Labor Standards Act (FLSA) preempted California law with respect to these employees. The superior court denied the motion because petitioners had not "demonstrated that Louisiana law should apply" or that California law has been preempted.

Petitioners sought a writ of mandate directing the superior court to vacate its order denying the motion for summary judgment and to enter a new order granting the motion. We issued an order to show cause and temporarily stayed all trial court proceedings. In our prior opinion, we applied a conflict of laws analysis and concluded that Louisiana law governed because that state had more significant contacts with the parties and a greater interest in regulating the employment relationships at issue.

After the Supreme Court granted review and transferred the matter back to us, we vacated our prior opinion and received supplemental briefs from the parties. We now conclude that California law applies and that the trial court correctly denied the motion for summary judgment.

*Facts*

Petitioners own and operate the Adele Elise, a vessel that provided services to oil platforms located off the California coast. The crew members represent a class of persons who were employed by petitioners to work on the Adele Elise after July 14, 2012. They allege petitioners failed to comply with numerous provisions of California's wage and hour laws.

Petitioners are limited liability companies formed under Louisiana law. Every member of both companies is also a Louisiana resident. The companies have their headquarters in Louisiana and the Adele Elise, the vessel on which crew members were employed, is registered in that state. Although the Adele Elise operated for a time in the Gulf of Mexico, it was repositioned to the Pacific Ocean in March 2011 and remained there until October 2017.

Petitioners' administrative functions are performed at their headquarters in Louisiana. Each former crew member traveled to Louisiana to apply in person for a job and to interview for that job. They also completed and acknowledged receipt of employment-related documents in Louisiana. Staff at petitioners' Louisiana office made arrangements to transport the crew members to and from the vessels to which they were assigned.

The crew members worked on the Adele Elise from March 2011 when it was repositioned from the Gulf of Mexico to the Pacific Ocean. In October 2017, the vessel left California.

3

Between 2011 and 2017, the Adele Elise was docked at Port Hueneme. While stationed at Port Hueneme, the Adele Elise traveled through the Santa Barbara Channel to deliver supplies and pick up refuse from four oil platforms located in federal waters off the California coast. Between July 2012 and May 2015, the Adele Elise made approximately three trips each week to the oil platforms. After an oil spill occurred in May 2015, the average number of weekly trips declined.

The crew members are a class that is represented by three named members: Claude Norris, Douglas Kwaw and James Musgrove. None of the named class representatives resides in California. Norris, a resident of Texas, was employed as an able-bodied seaman aboard the Adele Elise while it was stationed at Port Hueneme for 571.5 days from June 2013 to January 2016. Norris was paid a flat daily rate for his services, ranging from $140 to $350 per day. Kwaw, a resident of Ohio, was employed as an able-bodied seaman aboard the Adele Elise while it was stationed at Port Hueneme for 580.5 days between July 2013 and August 2015. He was paid a flat daily rate for his services, ranging between $265 to $350 per day. Musgrove, a resident of Mississippi, was employed as an engineer aboard the Adele Elise while it was stationed at Port Hueneme for 471.5 days between August 2013 and February 2016. He was paid a flat daily rate for his services, ranging between $310 to $750 per day. The employment of each class representative was terminated only because of a reduction in force. The crew members' wage and hour claims were made after their employment was terminated.

The crew members who were employed as able bodied seamen typically worked a "hitch" of 42 days on and 21 days off. Those employed as engineers worked 21 days on and 21 days off.

Each employee would travel by air from the airport closest to the crew member's home in Texas, Ohio, and Mississippi to Los Angeles, where they were shuttled to the vessel in Port Hueneme. At the end of their hitch, the employees would be shuttled back to the Los Angeles airport and flown back to their home states. Administrative employees of petitioners, who were located in Louisiana, made travel arrangements for the crew members.

Once they arrived at the vessel, the crew members were not permitted to leave the vessel without permission for the remainder of their hitch. Occasionally, they were asked to disembark when the vessel was in port, to run errands or pick up supplies. They worked at least 12 hours per day each day of their hitch, whether the vessel was docked at Port Hueneme or underway to or from the platforms. The job duties of crew members who were employed as deckhands and able-bodied seamen included handling tow and mooring lines, securing the vessel to docks and wharves, assisting in loading and unloading supplies, equipment and cargo, assisting with pumping water and fuel, cleaning the vessel and lifeboats, standing lookout, food preparation and cleaning the galley, repairing machinery and equipment, and performing other maintenance tasks such as painting, sanding, chipping and scraping the vessel.

Other crew members were employed as engineers. These employees' job duties included general engine maintenance, changing the engine oil, servicing the engine, pumping mud and chemicals off the vessel on the platforms, receiving fuel for the vessel and fueling the vessel on the platforms.

While docked at Port Hueneme, the Adele Elise would sail through the Santa Barbara Channel to deliver supplies to, and

pick up refuse from four oil platforms.  The vessel left from, and returned to the same port; it did not travel to other states.

Travel time from port to the first platform was approximately 7 hours.  After servicing the first platform, the vessel would travel to the second, third and fourth platforms and then back to Port Hueneme.  The journey from the fourth platform to Port Hueneme typically took about 8 hours.  The entire round trip lasted about 24 hours.

The port of Port Hueneme is located within the State of California while the oil platforms are located outside the state's boundaries.  On its route to and from the platforms, the Adele Elise sailed both inside and outside of California's state boundaries.  The parties dispute how much time the Adele Elise spent outside the state.  It is undisputed, however, that between March 2011 and October 2017, the Adele Elise docked exclusively at Port Hueneme, California.

*Discussion*

*Territorial Reach of California Law*

As our Supreme Court explained in *Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557 (*Tidewater*), federal law defines California's territorial boundaries more narrowly than does California state law.  Under California's state law definition of its own boundaries, "the entire Santa Barbara Channel is within the state." (*Id*. at p. 564.)  Under federal law, "the central portion of the Santa Barbara Channel is not within the state." (*Ibid*.)  "In defining California's federal law boundaries, Congress did not, however, suggest that California lacked power to regulate conduct outside those boundaries and within broader state law boundaries." (*Ibid*.)  To the contrary, "California employment laws implicitly extend to employment

6

occurring within California's state law boundaries, including all of the Santa Barbara Channel," unless "the operation of federal law were at issue, as for example if federal law conflicted with state law." (*Id.* at p. 565.)

In *Ward, supra*, 9 Cal.5th 732, our Supreme Court considered whether California residents who work for an airline based outside California and who perform most of their work in airspace outside California are nevertheless entitled to wage statements that comply with Labor Code section 226.[1] *Ward* concluded that the question whether the employees are entitled to "California-compliant wage statements depends on whether their principal place of work is in California." (*Ward, supra*, at p. 740.) For employees who do not perform a majority of their work in any one state, "this test is satisfied when California serves as their base of work operations, regardless of their place of residence or whether a collective bargaining agreement governs their pay." (*Ibid.*)

Noting that section 226 "is part of a matrix of laws intended to ensure workers are correctly and adequately compensated for their work," the court inferred "that the relevant geographic connection for purposes of determining what state law applies is where the work occurs." (*Ward, supra,* 9 Cal.5th at p. 753.) Under this test, California wage and hour laws apply "to workers who perform all or most of their work in the jurisdiction." (*Id.* at p. 754.) "For interstate transportation workers and others who do not work more than half the time in any one state, we conclude this principle will be satisfied if the worker performs some work here and is based in California,

---

[1] All statutory references are to the Labor Code.

7

meaning that California serves as the physical location where the worker presents himself or herself to begin work." (*Id*. at p. 755.)

*Ward* rejected the employer's contention that federal law should apply because the workers spend the majority of their time in federally regulated airspace. "[I]n the absence of any federal action, we have no reason to think applying California law would encroach on federal prerogatives, nor any reason rooted in considerations of comity to conclude the Legislature would have preferred that workers based in California go unprotected by section 226." (*Ward, supra,* 9 Cal.5th at p. 757.) Finally, the court declined to "place weight" on the state of the employees' residence, where they receive their wages, or where they pay taxes. (*Id*. at p. 758.) These factors are not, by themselves, determinative because California statutes may apply to non-residents who perform work in this state. (*Ibid*.; *see* also *Sullivan v. Oracle Corp.* (2011) 51 Cal.4th 1191, 1197 (*Sullivan*)..)

Following *Ward, Oman, supra*, 9 Cal.5th 762, held that "California's wage statement laws apply only to flight attendants who have their base of work operations in California, and that the same is true of California laws governing the timing of wage payments." (*Id*. at p. 770.) The class of flight attendants at issue in *Oman* included both residents of California and non-residents. None of the class members worked more than half the time in California, or in any other state. (*Id*. at p. 773.) Thus, the question whether class members were entitled to California-compliant wage statements "hinges on whether they were based for work purposes in California." (*Ibid.)* The same standards apply to section 204, which governs the timing of wage payments. (*Oman, supra*, at p. 778.)

8

Our Supreme Court noted in *Oman* that the employer's status as a nonresident corporation "does not foreclose the application of state law, " because section 226 "contains no exemption based on the employer's location." (*Oman, supra*, 9 Cal.5th at p. 773.) California's "power to protect employees within its borders is not limited by whether the worker might be a nonresident or might be employed by a nonresident entity. . . . If employees are based for work purposes in California, that is sufficient to trigger the requirements of section 226, regardless of where their employer resides." (*Ibid.*)

*Ward* and *Oman* establish that California's wage and hour laws apply to workers who perform all or most of their work in California. (*Ward, supra,* 9 Cal.5th at p. 754.) For workers who perform work in multiple jurisdictions, this test is satisfied if the worker performs some work in California and is based here, "meaning that California serves as the physical location where the worker presented himself or herself to begin work." (*Id* at p. 755.) Neither the residence of the worker nor the location of the employer is relevant to this analysis. (*Oman, supra*, 9 Cal.5th at p. 773.)

Here, the crew members of the Adele Elise performed the majority of their work within the boundaries of California. The port of Port Hueneme, where the Adele Elise was docked, and the entire Santa Barbara Channel are inside the state. (*Tidewater, supra*, 14 Cal.4th at p. 564; see also *Ward, supra*, 9 Cal.5th at p. 751 [employees at issue in *Tidewater,* who were California residents employed on a maintenance vessel docked at Port Hueneme, "did work exclusively in California . . . ."].) Under *Ward* and *Oman*, the crew members are entitled to the protection

9

of California law because they performed all or most of their work in this state.

We note that, unlike the vessels at issue in *Tidewater*, the Adele Elise also sailed outside of California's boundaries and into international waters. This circumstance does not alter our conclusion. The Adele Elise was docked at Port Hueneme and crew members were on duty while the vessel was in port. The vessel returned exclusively to Port Hueneme after visiting each of the oil platforms. On its journey, the Adele Elise sailed through the Santa Barbara Channel, which is located in California. Crew members were on duty and working during those voyages. Work performed in California's territorial waters is subject to California employment law even though the waters are also within federal territorial boundaries. (*Ward*, *supra*, 9 Cal.5th at p. 751; *Tidewater, supra,* 14 Cal.4th at pp. 565-566, 578-579.) California law governs the employment relationships at issue here because California served as the base for the crew members' work operations, all or most which were performed in California. (*Ward, supra*, at pp. 740, 754.)

*Conflict of Laws*

In our prior opinion, we applied the conflict of law analysis outlined in *Sullivan*, *supra*, 51 Cal.4th 1191, and concluded that Louisiana, rather than California law, governs petitioners' employment relationship with the crew members. "'First, the court determines whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different. Second, if there is a difference, the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists.

10

Third, if the court finds that there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law "to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state" [citation], and then ultimately applies "the law of the state whose interest would be the more impaired if its law were not applied."' [Citations.]" (*Id.* at pp. 1202–1203; see also *Chen v. Los Angeles Truck Centers, LLC* (2019) 7 Cal.5th 862, 867-868.)

Our prior opinion concluded that Louisiana had a greater interest in regulating these employment relationships because the employers were based in Louisiana and many of the administrative aspects of the employment relationship were centered in that state. In this regard, we were mistaken. *Oman* clarifies that the relevant consideration is the location in which work is performed. Here, that location is California. Other considerations, such as the residence of the employees or the location of the employer, are not relevant. (*Oman, supra*, 9 Cal.5th at p. 773.) Thus, California law applies here because the crew members' work was performed in California. Louisiana law does not apply for the same reason: the crew members did not perform work in Louisiana.

*Preemption*

Petitioners urge us to conclude that the federal Fair Labor Standards Act (FLSA) and "general maritime law" preempt California's wage and hour regulations with respect to the crew members. We conclude there is no preemption.

"Preemption may occur in three situations: (1) where the federal law expressly so states, (2) where the federal law is so comprehensive that it leaves "'no room" for supplementary state

11

regulation,' or (3) where the federal and state laws 'actually conflict[].'" (*Tidewater*, *supra*, 14 Cal.4th at p. 567.)  As our Supreme Court explained in *Tidewater*, the FLSA does not expressly preempt state employment laws, nor does it contain any provision that actually or implicitly conflicts with California statutes.  (*Id*. at pp. 567-568.)  In sum, there is "no evidence that Congress intended the FLSA's seamen exemption to preempt state law." (*Ibid.*; see also *Pacific Merchant Shipping Ass'n v. Aubry* (9th Cir. 1990) 918 F.2d 1409, 1425 [FLSA does not preempt California overtime provisions as applied to California-resident-seamen].)

For the same reason, we reject petitioners' contention that "general maritime law" preempts California law.  *Tidewater* held that the FLSA does not preempt state law for California residents employed as seamen in the Santa Barbara Channel. *Ward* and *Oman* instruct that the residence of the employee is not determinative because California law also applies to non-resident employees who perform most of their work within California.  The crew members at issue here perform most of their work in California.  *Tidewater*'s holding, that federal law does not preempt California law for California residents who work in the Santa Barbara Channel, thus applies with equal force to these non-residents who work in the same location.

### *Disposition*

The petition for writ of mandate is denied.  The order to show cause is discharged and the stay heretofore issued is dissolved.  Real parties shall recover their costs.

12

CERTIFIED FOR PUBLICATION.


YEGAN, Acting P. J.

We concur:


PERREN, J.


TANGEMAN, J.

13

Vincent J. O'Neil, Jr., Judge

Superior Court County of Ventura

_____

Akin Gump Strauss Hauer & Feld and Gregory W. Knopp; Phelps Dunbar and Jolee Land; and David M. Korn for Petitioners.

No appearance for Respondent.

Rothschild & Alwill and Kristi D. Rothschild for Real Parties in Interest.