[No. B041178. Second Dist., Div. Three. Sept. 5, 1990.]

UNION OF AMERICAN PHYSICIANS AND DENTISTS et al., Plaintiffs and Respondents, v.
KENNETH KIZER, as Director, etc., et al., Defendants and Appellants.

**COUNSEL**

John K. Van de Kamp, Attorney General, Charlton G. Holland III, Assistant Attorney General, Stephanie Wald and Harlan E. Van Wye, Deputy Attorneys General, for Defendants and Appellants.

Davis, Cowell & Bowe, Richard G. McCracken and Andrew J. Kahn for Plaintiffs and Respondents.

**OPINION**

**KLEIN, P. J.**—Defendants and appellants the California Department of Health Services and its Director, Kenneth Kizer (hereafter, the Department), appeal a judgment in an action in mandamus and for injunctive and declaratory relief instituted by plaintiffs and respondents the Union of American Physicians and Dentists, a California nonprofit corporation (the UAPD) and its president, Sanford Marcus, M.D. (collectively, the UAPD).

The issues presented are (1) whether the Department's use of statistical sampling and extrapolation in provider audits and its promulgation of claims documentation requirements amounted to invalid "underground" regulations, and if so, (2) the nature of the relief to which UAPD members are entitled.

We conclude, inter alia, the trial court properly held the Department's challenged practices were infirm and unenforceable because said practices were not adopted in accordance with the Administrative Procedure Act (APA) (Gov. Code, § 11340 et seq.). (*Grier* v. *Kizer* (1990) 219 Cal.App.3d 422, 440 [268 Cal.Rptr. 244] (review den. June 21, 1990).) However, because statistical sampling and extrapolation does not substantially change the legal effect of past events, the Department may utilize such audit method in audits which were pending at the time it promulgated a formal regulation covering the method. (Cal. Code Regs., tit. 22, § 51458.2.)[1] The judgment therefore is modified in part and otherwise is affirmed.

---

[1] The California Code of Regulations will hereafter be referred to as Cal. Code Regs.

FACTUAL AND PROCEDURAL BACKGROUND

For a number of years, the Department conducted audits of Medi-Cal providers by taking a small random sample of Medi-Cal claims, determining the error rate within that sample, and then extrapolating that error rate over the total amount received by the provider during the period covered by the audit. In addition, the Department utilized claims documentation requirements set forth in (1) Medi-Cal Bulletin No. 86B dated July 1978 (the 1978 Bulletin), (2) Medical Services Bulletin No. 66 dated May 1983 (the 1983 Bulletin), and (3) pages 3-77 through 3-80 of the Medi-Cal Provider Manual (the Provider Manual). Where the providers' records did not comport with those requirements, the Department would invalidate the charges and would seek to recover any amount it had overpaid.

In 1986, the UAPD, which has numerous members who are Medi-Cal providers, asked the Office of Administrative Law (OAL) to determine whether the sampling/extrapolation method and documentation requirements amounted to "underground" regulations in violation of the APA. On August 6, 1987, the OAL issued 1987 OAL Determination No. 10 (Docket No. 86-016), concluding the challenged rules should have been the subject of formal regulations and were infirm because they were not promulgated pursuant to the APA.

Thereafter, the Department codified the challenged rules in compliance with the APA, which requires an agency to give notice of the proposed adoption of a regulation and to afford interested persons the opportunity to present comments on the proposed regulatory action. (Gov. Code, §§ 11346.4, 11346.8.) The Department promulgated (1) a regulation on statistical sampling and extrapolation of Medi-Cal provider reviews (Cal. Code Regs., tit. 22, § 51458.2, eff. May 13, 1988) and (2) a regulation incorporating by reference the American Medical Association's Physician's Current Procedural Terminology, which is a coded listing and description of medical services (Cal. Code Regs., tit. 22, § 51050 as amended eff. Oct. 31, 1987).

On April 27, 1988, the UAPD filed a petition for writ of mandate pursuant to Code of Civil Procedure section 1085 (section 1085), and for injunctive and declaratory relief. The UAPD sought to bar the Department from utilizing the challenged underground regulations in audit proceedings and to compel the Department to return monies it had obtained using those regulations.

The Department opposed the petition, contending state and federal law authorized it to use statistical sampling in auditing providers, that the OAL's adverse determination was not binding, and that the individual

providers who had failed to pursue an administrative appeal had waived the right to recoup funds through the UAPD's action.

A hearing on the petition was held on July 18, 1988. The trial court ruled "[a]udits done prior to May 15, 1988, are invalid as there was no compliance with the [APA]." It continued the matter for additional briefing on the issue of return of funds.

A further hearing was held on September 8, 1988. The trial court then held the sampling and extrapolation methodology and documentation requirements were invalid and unenforceable for failure to comply with the APA. The judgment bars the Department from utilizing its underground regulations with respect to probability sampling and statistical extrapolation or the documentation guidelines contained in the Bulletins and Provider Manual. However, it permits the Department to utilize California Code of Regulations, title 22, sections 51458.2 and 51050 in provider audits *commenced after* the effective dates of those regulations.[2] The case was ordered remanded to the Department with respect to any claims of reimbursement by provider members of the UAPD.

## CONTENTIONS

The Department contends: (1) it had authority to use the challenged rules; (2) the OAL's determination is erroneous and nonbinding; (3) UAPD members whose audits were final at the time this litigation was commenced are not entitled to a return of monies paid as a result of those audits; and (4) on remand it may employ statistical sampling and extrapolation to audit providers whose audits were not yet final at the time California Code of Regulations, title 22, section 51458.2 took effect.

## DISCUSSION

1. *Challenged practices were invalid underground regulations.*

■ Welfare and Institutions Code section 14124.5, found within the California Medi-Cal Act (Welf. & Inst. Code, §§ 14000 et seq., 14000.4) explicitly makes the Department's rule making subject to the provisions of the APA. (*Grier, supra,* 219 Cal.App.3d at pp. 432-433.) The APA prohibits state agencies from utilizing any rule which is a regulation as defined in Government Code section 11342, subdivision (b), unless the rule has been duly adopted as a regulation. (Gov. Code, § 11347.5.) A regulation is defined as "every rule, regulation, order, or standard of general application . . . adopted by any state agency to implement, interpret, or make specific

---

[2] In an obvious clerical error, the judgment refers to California Code of Regulations, title 22, section "51488.2 (effective May 15, 1988)" instead of California Code of Regulations, title 22, section 51458.2, operative May 13, 1988. We construe the judgment to refer to the correct regulation and effective date.

the law enforced or administered by it, or to govern its procedure, except one which relates only to the internal management of the state agency." (Gov. Code, § 11342, subd. (b).)

a. *Under Grier, Department's use of statistical sampling and extrapolation in provider audits required adoption of formal regulation.*

Many of the Department's arguments in the instant appeal were addressed and disposed of in our opinion in *Grier* v. *Kizer, supra,* 219 Cal.App.3d 422, wherein we held the Department's failure to promulgate a formal regulation in compliance with the APA with respect to statistical sampling and extrapolation precluded it from utilizing such method. We held the internal management exception to the APA, invoked by the Department, to be narrow and inapplicable where a rule is to have general application and is to affect persons subject to regulation by the agency. (*Id.,* at p. 440.)

In *Grier,* we rejected the Department's position that its use of probability sampling and extrapolation was entitled to great weight as its own administrative interpretation of the Medi-Cal Act. " 'To hold otherwise might help perpetuate the problem' of ' " 'house rules of the agency' " ' which are promulgated without public notice, opportunity to be heard, filing with the Secretary of State, and publication in the California Code of Regulations. [*Armistead, supra,* 22 Cal.3d at p. 205.]" (*Grier, supra,* 219 Cal.App.3d at p. 435.)

■ On the other hand, the OAL's determination invalidating the challenged audit method was entitled to due consideration because the OAL is charged with interpreting whether an agency rule is a regulation as defined in Government Code section 11342, subdivision (b). (*Grier, supra,* 219 Cal.App.3d at pp. 434-435.)[3]

The OAL's analysis set forth a two-part test: " 'First, is the informal rule either a rule or standard of general application or a modification or supplement to such a rule? [¶] Second, does the informal rule either implement, interpret, or make specific the law enforced or administered by the agency or govern the agency's procedure?' (1987 OAL Determination No. 10, [(Docket No. 86-016) Aug. 6, 1987].)" (*Grier, supra,* 219 Cal.App.3d at p. 434.)

The OAL concluded this particular audit method "was a standard of general application 'applied in every Medi-Cal case reviewed by [Depart-

---

[3] We may consider the OAL's determination because the UAPD filed its request for the OAL determination in December 1986, prior to filing the petition for writ of mandate. (Gov. Code, § 11347.5, subd. (e)(2).)

ment] audit teams and . . . used to determine the amount of overpayment.' Further, the method implemented [Welf. & Inst. Code] sections 14170 and 14133, which authorize the Department to audit providers and to take appropriate steps to recover overpayments. The Department thus had the rulemaking authority to adopt regulations concerning the use of probability sampling and statistical extrapolation, and was required to comply with the APA before utilizing such audit method. (1987 OAL Determination No. 10, *supra*.)" (*Grier, supra*, 219 Cal.App.3d at pp. 434-435.)

The Department argued, however, that it was not required to promulgate a formal regulation because statistical sampling and extrapolation is the only legally tenable interpretation of its statutory auditing authority under Welfare and Institutions Code sections 14133 and 14170.[4]

We rejected the Department's contention that it was applying the sole tenable interpretation of those statutes. While statistical sampling and extrapolation may be more feasible or cost effective, the Department was required to adopt a formal regulation under the APA because a line by line audit is an alternative tenable interpretation of the Department's statutory auditing authority. (*Grier, supra*, 219 Cal.App.3d at pp. 438-439.)

▆ The Department also maintained that by refraining from the adoption of a formal regulation, it advanced the APA's goal of reducing the number of administrative regulations. (Gov. Code, § 11340.1) We held it is for the OAL to determine whether a regulation is necessary and nonduplicative, and a regulation found to be unnecessary will be disapproved by the OAL. (Gov. Code, § 11349.1, subd. (a)(1), (6); *Grier, supra*, 219 Cal.App.3d at p. 439.)

We further observed a major aim of the Legislature in enacting the APA was to provide an opportunity for persons to be affected by proposed regulatory action to be heard on the merits of the proposal. (*Grier, supra*, 219 Cal.App.3d at p. 435; *Armistead* v. *State Personnel Board* (1978) 22 Cal.3d 198, 204 [149 Cal.Rptr. 1, 583 P.2d 744].) We concluded the challenged audit method was a standard of general application implementing the Department's statutory auditing authority and therefore concurred in the OAL's determination that the method was an improper " 'underground' " regulation which should have been adopted pursuant to the APA. (*Grier, supra*, 219 Cal.App.3d at p. 440.)

---

[4] Welfare and Institutions Code section 14170 directs the Department to audit providers "in the manner and form prescribed by the department," and Welfare and Institutions Code section 14133 authorizes postpayment audits.

(1) *Title 42 Code of Federal Regulations section 456.22 is inapposite.*

■ An issue raised by the Department in the instant appeal and not addressed in *Grier* is whether 42 Code of Federal Regulations section 456.22 mandates the use of statistical sampling techniques. That section, dealing with sample basis *evaluation* of services, provides: "To promote the most effective and appropriate use of available services and facilities the Medicaid agency must have procedures for the on-going evaluation, on a sample basis, *of the need for and the quality and timeliness of Medicaid services.*"

This section plainly is unavailing to the Department. It does not mandate the use of statistical sampling in provider audits. Rather, it authorizes sampling to evaluate the need, quality and timeliness of services.

For all these reasons, we reject the Department's argument that it was not required to comply with the APA prior to employing statistical sampling and extrapolation in provider audits.

b. *Department's requirements as to documentation of physician office visits under Medi-Cal program likewise were underground regulations.*

By way of background, California Code of Regulations, title 22, section 51503, subdivision (b), incorporates by reference the 1969 California Relative Value Studies, fifth edition (hereafter RVS), published by the California Medical Association, which publication assigns a unit value to a given procedure. To make a claim for services rendered to a Medi-Cal beneficiary, the provider selects the appropriate code number from the RVS (since retitled the California Standard Nomenclature (CSN)). The physician then submits the claim form with the code number and is paid by the Department accordingly.

In issue are the documentation requirements set forth in the 1978 Bulletin, the 1983 Bulletin, and four pages of the Provider Manual. The OAL determined all three of these challenged rules were regulations as defined in the APA and therefore, were invalid and unenforceable unless adopted in compliance with the APA. (1987 OAL Determination No. 10, [Docket No. 86-016 Aug. 6, 1987].)

On appeal, the Department argues the trial court erred in concurring in the OAL's determination because regulatory authority, specifically California Code of Regulations, title 22, section 51503, which incorporates the 1969 California RVS, supports the Department's use of the challenged Bulletin and Provider Manual provisions.

The Department's reliance on California Code of Regulations, title 22, section 51503 is misplaced. While California Code of Regulations, title 22, section 51503 incorporates the 1969 California RVS, and the RVS lists code numbers followed by brief titles and a unit value, as discussed below, the two Bulletins and Manual go far beyond what is contained in the RVS.

(1) *The 1978 Bulletin.*

The 1978 Bulletin's stated purpose is *"to supplement* information in the CMA Relative Value Studies and *to help clarify* billing guidelines."

Specifically, the 1978 Bulletin supplements the California RVS by defining six recognized *levels of service* a provider must use in coding the services rendered: minimal, brief, limited, intermediate, extended and comprehensive. For instance, an *intermediate* level of service is defined as "[a] level of service pertaining to the evaluation of a new or existing condition complicated with a new diagnostic or management problem not necessarily relating to the primary diagnosis that necessitates the obtaining and evaluation of pertinent history and physical or mental status findings, diagnostic tests and procedures, and the ordering of appropriate therapeutic management; or a formal patient, family, or hospital staff conference regarding patient medical management and progress. For example: [¶] a. The evaluation of a patient with arteriosclerotic heart disease with recent onset of unstable angina . . . . [¶] b. Review of hospital studies and course in conjunction with a team conference . . . regarding medical management of a patient with acute schizophrenic symptoms. [¶] c. Review of interval history, re-examination of musculoskeletal systems and abdomen, discussion findings, and adjustment of therapeutic program in a patient with arthritic disorders with recently developed gastric complaints. [¶] d. Reviewing school reports, developmental examinations, and/or psychometric tests in conference with parents of a child with a recurrent school problem. [¶] e. Review of recent illness, re-examination of pharynx, neck, axilla, groin, and abdomen, interpretation of laboratory tests, and prescription of treatment in a patient with chronic lymphocytic leukemia not responding to a previous management plan. [¶] f. Conference with patient and/or family to review studies, hospital course, and findings in a teenager with acute hepatitis secondary to drug use."

In marked contrast, the 1969 California RVS tersely defines an intermediate service as a "complete history and physical examination of one or more organ systems, but not requiring a comprehensive evaluation of the patient as a whole."

Accordingly, the 1978 Bulletin amounts to a regulation because it is a standard of general application adopted by the Department to implement,

interpret or make specific the law enforced or administered by it. (Gov. Code, § 11342, subd. (b).)

(2) *The 1983 Bulletin.*

Similarly, the 1983 Bulletin states: *"To assist providers . . .* pages are included with this bulletin containing definitions taken from the fourth edition of 'Current Procedural Terminology' (published by the American Medical Association) and *are intended to supplement* the definitions in the California Standard Nomenclature. These definitions are being republished and were previously sent to providers in a Medi-Cal bulletin dated July 1978." (Italics added.)

The Department argues its use of these American Medical Association definitions merely transmits to providers the standard and accepted professional definitions so that records are properly kept and auditors and providers are speaking the same language. However, bulletins which "implement, interpret, or make specific" the law enforced by an agency invoke the APA. (Gov. Code, § 11342, subd. (b).)

Further, the 1983 Bulletin creates a rebuttable presumption regarding coverage for return office visits. It states coverage for return office visits is "ordinarily limited" to RVS 90050 (limited examination) or less, but higher coded visits are covered where a substantial change in condition or a substantial new illness or other circumstances require extensive re-evaluation. We agree with the OAL that an informal rule which creates a presumption and then indicates how to rebut it is a regulation within the meaning of the APA. (1987 OAL Determination No. 10, *supra.*)

(3) *Pages 3-77 to 3-80 of the Provider Manual.*

The last of these challenged rules, consisting of four pages in the Provider Manual, was included with the 1983 Bulletin discussed above. The pages set forth documentation requirements for six recognized levels of service performed in office visits. In response to a request by the UAPD, the Department acknowledged using these pages as part of its "written criteria" for evaluating whether "a provider's progress notes satisfy the appropriateness and quality of medical services requirements."

Accordingly, we concur in the OAL's determination that these three challenged rules constituted standards of general application to providers statewide, which were aimed at supplementing the RVS (incorporated into California Code of Regulations, title 22, section 51503, subdivision (b)) and which interpreted or made specific the law enforced by the Department. (1987 OAL Determination No. 10, *supra.*)

Separately, in addition to relying on California Code of Regulations, title 22, section 51503, the Department argues the challenged documentation requirements were "simply informational in nature and do not seek to substantially regulate behavior." The contention is unpersuasive because, as discussed above, agency rules which "interpret, or make specific" the law enforced by the agency require the promulgating agency to comply with the APA. (Gov. Code, § 11342, subd. (b).)

The Department also urges that compelling the adoption of formal regulations to cover the subject matter of informational bulletins such as these "would require the felling of a forest to provide the paper for an infinitely expanding regulatory code." The Department has raised this argument before, unsuccessfully. The mere desire to check the growth of administrative regulation does not excuse an agency from complying with the APA. It is the role of the OAL to determine whether a proposed regulation is necessary and nonduplicative, and the OAL will disapprove any proposed regulations which it finds to be superfluous. (Gov. Code, § 11349.1, subd. (a)(1), (6); *Grier* v. *Kizer, supra,* 219 Cal.App.3d at p. 439.)

Lastly, the Department argues the UAPD failed to state a cause of action under Code of Civil Procedure section 1085 because the Department had authority under state and federal law to utilize statistical sampling and documentation requirements without adopting formal regulations. Having already determined the challenged rules should have been the subject of formal regulations, we find the Department's argument to be without merit.

*2. UAPD members may seek reimbursement of funds paid pursuant to audits, notwithstanding failure to pursue administrative audit appeal.*

■ The Department argues this litigation can have no effect on audits which were closed by virtue of their being beyond the time for appeal at the time litigation commenced on April 27, 1988. It urges that irrespective of the invalidity of the challenged rules, UAPD members whose audits were final at the time this litigation commenced cannot recover monies paid pursuant to audit. The Department invokes California Code of Regulations, title 22, section 51022, subdivision (b), which requires noninstitutional providers to request a hearing on any disputed audit finding within 30 days. Further, Welfare and Institutions Code section 14171, subdivision (j), provides the final decision in a provider audit appeal "shall be reviewable in accordance with Section 1094.5 of the Code of Civil Procedure within six months of the issuance of the director's final decision."

The Department raised a similar argument in *Grier*. It urged the provider's APA challenge to its authority to use statistical sampling was untimely

because the provider failed to raise that *issue* at the administrative level and instead, the provider first raised the issue in the superior court. (*Grier* v. *Kizer, supra*, 219 Cal.App.3d at p. 430.) We rejected the Department's contention, recognizing that "[f]utility is an exception to the exhaustion of administrative remedies doctrine. (*McKee* v. *Bell-Carter Olive Co.* (1986) 186 Cal.App.3d 1230, 1245 [231 Cal.Rptr. 304].)" (*Grier, supra*, at pp. 430-431.) We concluded that because the Department at all times had maintained it had statutory authority to utilize sampling and extrapolation, such challenge by Grier at the administrative level would have been futile. (*Id.,* at p. 431.)

*Grier* is distinguishable in that the provider there did pursue an administrative appeal of the audit findings, and merely failed to raise the APA issue at that level. Nonetheless, in *Grier* we recognized while audit findings are properly reviewed administratively, it would have been futile at the administrative level to raise the threshold question of the Department's failure to comply with the APA. Further, even at this late stage, the Department continues to maintain the challenged rules do not contravene the APA. Thus, a challenge by individual UAPD members at the administrative level based on the Department's failure to comply with the APA undeniably would have been futile.

Moreover, the issues presented in the UAPD's action do not involve disputed audit findings after a hearing, but rather, implicate the Department's authority to utilize its underground regulations in auditing providers. In *Californians for Native Salmon etc. Assn.* v. *Department of Forestry* (1990) 221 Cal.App.3d 1419 [271 Cal.Rptr. 270], it was contended the complaint for declaratory relief was time barred because Public Resources Code section 21080.5, subdivision (g) imposes a 30-day statute of limitations for challenges to timber harvest plan approvals. The contention was rejected because the 30-day statute of limitations applies to specific approval decisions, not to a general challenge to an ongoing, existing policy. (*Id.,* at p. 1431, fn. 5.)

The reviewing court also observed that judicial economy strongly favored the use of declaratory relief to "avoid a multiplicity of actions, i.e., a large number of mandate proceedings challenging specific [timber harvest plan] approvals all raising identical or nearly identical questions concerning [the agency's] policies." (*Californians for Native Salmon etc. Assn., supra*, 221 Cal.App.3d at p. 1430.)

We are faced with this very situation. Many of the arguments raised in the instant case reiterate those previously presented in *Grier*. In view of the futility of litigating the APA issue at the administrative level, the

desirability of avoiding piecemeal litigation, and the fact the UAPD suit is a broad challenge to certain Department practices, we conclude to the extent UAPD members who did not pursue an administrative appeal base their claim for recovery of audit payments on the Department's unlawful use of underground regulations, their failure to exhaust the administrative remedy is not fatal to their claims.

Our holding in this regard is narrow. We merely hold that on remand, the Department cannot invoke the failure by individual providers to pursue or exhaust their administrative remedies to deny their claims for reimbursement of monies paid pursuant to improper audits.[5]

### 3. *Applicability of sampling and extrapolation on remand.*

■ The judgment permits the Department to utilize California Code of Regulations, title 22, section 51458.2 (authorizing use of sampling and extrapolation) only in audits commenced *after* May 13, 1988, the effective date of said regulation. The Department, however, seeks to utilize statistical sampling on remand to audit UAPD members whose audits were still open at the time California Code of Regulations, title 22, section 51458.2 took effect.

Due to the posture of the *Grier* case, this issue was not properly before us. Final judgment barring the Department from using statistical sampling in auditing the provider was entered on April 25, 1988.[6] California Code of Regulations, title 22, section 51458.2 became operative subsequently, on May 13, 1988. Thus, we had no occasion to address whether the new regulation authorized statistical sampling in audits which were pending at the time the regulation was adopted. In this case, the issue is timely.

The Department submits that since statistical probability sampling is a currently effective procedure or process and not a matter of substance, it properly may be utilized on reexamination of individual Medi-Cal providers. The UAPD contends the use of California Code of Regulations, title 22, section 51458.2 in audits commenced prior to its effective date would be an impermissible retroactive application of the regulation. The UAPD's retroactivity argument lacks merit.

Generally, the same rules of construction and interpretation which apply to statutes govern the construction and interpretation of administrative

---

[5]Thus, while individual UAPD members were entitled to avoid exhaustion of administrative remedies, they still were required to file suit in the trial court within the applicable statute of limitations. (See *Pacific Coast Medical Enterprises* v. *Department of Benefit Payments* (1983) 140 Cal.App.3d 197, 215 [189 Cal.Rptr. 558].)

[6]We have taken judicial notice of the record in *Grier* v. *Kizer, supra,* 219 Cal.App.3d 422, pursuant to Evidence Code, sections 452, subdivision (d), 459.

regulations. (*Cal. Drive-in Restaurant Assn.* v. *Clark* (1943) 22 Cal.2d 287, 292 [140 P.2d 657, 147 A.L.R. 1028].) " '[I]t is an established canon of interpretation that statutes are not to be given a retrospective operation unless it is clearly made to appear that such was the legislative intent.' [Citation.]" (*Evangelatos* v. *Superior Court* (1988) 44 Cal.3d 1188, 1207 [246 Cal.Rptr. 629, 753 P.2d 585].)

However, a statute is not retroactive unless "it substantially changes the legal effect of past events. [Citations.]" (*Kizer* v. *Hanna* (1989) 48 Cal.3d 1, 7 [255 Cal.Rptr. 412, 767 P.2d 679].) "A statute does not operate retroactively merely because some of the facts or conditions upon which its application depends came into existence prior to its enactment. [Citations.]" (*Id.*, at pp. 7-8.)

California Code of Regulations, title 22, section 51458.2 does not substantially alter the legal effect of past events and merely serves to expedite provider audits. Assuming the use of random sampling and extrapolation is statistically valid, such audit method does nothing to alter the amount of compensation to which a provider otherwise is entitled.[7] Because the use of statistical sampling and extrapolation pursuant to California Code of Regulations, title 22, section 51458.2 will not substantially change the legal effect of events which occurred prior to its May 13, 1988 effective date, the regulation may be utilized in audits which were commenced prior to that date.

*4. UAPD's request for modification of judgment not properly before us.*

■ The judgment remands the case to the Department with respect to any claims of reimbursement by providers who are UAPD members. The UAPD, in its respondent's brief, urges this court to modify the judgment to provide for the requested reimbursements instead of a remand to the Department.

"A respondent who intends to argue that the appellate court should change the judgment . . . must file a notice of cross-appeal. A judgment or order cannot be changed as a result of the arguments in a respondent's brief, because the goal of a respondent's brief is to preserve the judgment being attacked by appellant. (*Puritan Leasing Co.* v. *August* (1976) 16 Cal.3d 451, 463 . . . .)" (Cal. Civil Appellate Practice (Cont.Ed.Bar 1985) § 9.2, p. 262.)

---

[7] In contrast, because office visit documentation requirements are substantive, the retroactive use of such requirements would change the legal effect of past events.

Accordingly, the UAPD's request for modification of the judgment is not properly before us.[8]

## CONCLUSION

The Department's use of random sampling and extrapolation of audit findings, and its promulgation of documentation requirements to supplement the RVS, amounted to invalid underground regulations because they were standards of general application which implemented or made specific the law administered by the Department.

To the extent UAPD members who did not pursue an administrative audit appeal base their claim for recovery of audit payments on the Department's unlawful use of underground regulations, because an APA challenge would have been futile at the administrative level, their failure to exhaust the administrative remedy is not fatal to their claims.

Because the use of random sampling and extrapolation does not substantially change the legal effect of past events, the Department may employ California Code of Regulations, title 22, section 51458.2 on remand without restriction.

## DISPOSITION

The judgment is modified to allow the Department to use California Code of Regulations, title 22, section 51458.2 on remand without restriction, and otherwise is affirmed. Each party to bear respective costs on appeal.

Danielson, J., and Croskey, J., concurred.

---

[8] Also not properly before us is the UAPD's further contention that California Code of Regulations, title 22, section 51458.2 fails to comply with the APA's clarity requirement because the regulation does not specify the statistical method to be used. (Gov. Code, § 11349.1, subd. (a)(3).)