[No. C061696. Third Dist. Sept. 21, 2010.]

CLOVIS UNIFIED SCHOOL DISTRICT et al., Plaintiffs and Appellants, v. JOHN CHIANG, as State Controller, etc., Defendant and Appellant.

796

## COUNSEL

Lozano Smith, Gregory A. Wedner and Sloan R. Simmons for Plaintiffs and Appellants.

Richard L. Hamilton for California School Boards Association and Its Education Legal Alliance as Amicus Curiae on behalf of Plaintiffs and Appellants.

Edmund G. Brown, Jr., Attorney General, Jonathan K. Renner, Assistant Attorney General, Douglas J. Woods and Kathleen A. Lynch, Deputy Attorneys General, for Defendant and Appellant.

## OPINION

**BUTZ, J.**—This declaratory relief and writ of mandate action concerns the validity of two auditing rules used by defendant State Controller (Controller). The Controller used these rules in reducing state-mandated reimbursement claims for employee salary and benefit costs submitted from plaintiff school districts and community college districts (hereafter plaintiffs).

*Contemporaneous Source Document Rule (CSDR)*

The first auditing rule is referred to by plaintiffs as the contemporaneous source document rule (CSDR). The Controller used this rule to reduce reimbursement claims for the following four state-mandated school district programs during the challenged period straddling fiscal years 1998 to 2003: (1) the school district of choice (SDC) program (SDC Program); (2) the emergency procedures, earthquake procedures and disasters program (EPEPD Program); (3) the

intradistrict attendance program (Intradistrict Attendance Program); and (4) the collective bargaining program (Collective Bargaining Program). We conclude this rule was an invalid underground regulation under the state Administrative Procedure Act (APA) during this period. (Gov. Code, § 11340 et seq.)[1] Consequently, we overturn the Controller's audits for these four programs during this period to the extent they were based on this rule.

*Health Fee Elimination Program: Health Fee Rule*

The second auditing rule is the "Health Fee Rule," which the Controller used to reduce reimbursement claims for state-mandated health services provided by the plaintiff community college districts pursuant to the health fee elimination program (Health Fee Elimination Program). We uphold the validity of this rule.

The trial court (1) invalidated the CSDR as applied to the Intradistrict Attendance and Collective Bargaining Programs (from which the Controller appeals); (2) hinted at the CSDR's invalidity as applied to the SDC and EPEPD Programs but did not grant relief thereon, apparently deeming the administrative remedy sufficient (from which the school districts appeal); and (3) upheld the validity of the Health Fee Rule (from which the community college districts appeal). We shall affirm the judgment regarding the Intradistrict Attendance Program, the Collective Bargaining Program, and the Health Fee Rule, but reverse the judgment, with directions, regarding the SDC and EPEPD Programs.

Because the issues raised in this appeal are almost entirely legal ones subject to our independent review (see *Grier v. Kizer* (1990) 219 Cal.App.3d 422, 434 [268 Cal.Rptr. 244], disapproved on a different ground in *Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 577 [59 Cal.Rptr.2d 186, 927 P.2d 296] (*Tidewater*) [whether an auditing rule is an APA regulation is a question of law]), it is unnecessary to set forth a factual background at this stage. Instead, we will proceed straight to our discussion. First, we will briefly summarize the process of state-mandated reimbursement and the concept of underground regulation. Then we will turn our attention to the programs and remedies at issue, weaving in the pertinent facts as we go.

## DISCUSSION

### I.  State-mandated Reimbursement Process

■  In 1979, California's voters adopted article XIII B, section 6 of the state Constitution, which specifies that if the state imposes any "new program

---

[1] Undesignated statutory references are to the Government Code.

or higher level of service" on any local government (including a school district), the state must reimburse the locality for the costs of the program or increased level of service.

In 1984, the Legislature enacted statutes to govern the state mandate process. (§ 17500 et seq.) Under these statutes, the Commission on State Mandates (the Commission) determines, pursuant to a "test claim" process, whether a state program constitutes a reimbursable state mandate. (§§ 17551, subd. (c), 17553.)

Once the Commission determines that a state mandate exists, it adopts regulatory "[P]arameters and [G]uidelines" (P&G's) to govern the state-mandated reimbursement. (§ 17557.) The Controller, in turn, then issues nonregulatory "[C]laiming [I]nstructions" for each Commission-determined mandate; these instructions must derive from the Commission's test claim decision and its adopted P&G's. (§ 17558.) "Claiming Instructions" may be specific to a particular mandated program, or general to all such programs.

The Controller may audit a reimbursement claim filed by a local agency or school district within three years of the claim's filing or last amendment. (§ 17558.5, subd. (a).)

If the Controller reduces a specific reimbursement claim via an audit, the claimant may file an "[I]ncorrect [R]eduction [C]laim" with the Commission. (§ 17558.7, subd. (a).)

## II. The Concept of Invalid Underground Regulation

In their petitions for writ of mandate and complaints for declaratory relief, the school districts (comprising Clovis, Fremont, Newport-Mesa, Norwalk-La Mirada, Riverside, Sweetwater, and San Juan; hereafter collectively, School Districts) allege that the CSDR constitutes an invalid, unenforceable underground regulation under the APA as applied by the Controller in auditing salary and benefit costs in reimbursement claims for the SDC, EPEPD, Intradistrict Attendance, and Collective Bargaining Programs during the applicable periods roughly encompassing the fiscal years 1998 to 2003.[2]

[2] Because of the large number of school districts and program audits involved, as well as the slightly varying fiscal years at issue corresponding to these districts and program audits, we will use the general phrasing "applicable periods roughly encompassing the fiscal years 1998 to 2003" to describe the audits at issue. The parties are well aware of the particular audits being challenged for this period. Regardless, the School Districts must meet the applicable three-year statute of limitations that governs lawsuits based on statutory liability (like state-mandated reimbursement) for any audits of the four programs that have been determined on the basis of the invalidated CSDR. (Code Civ. Proc., § 338; *Union of American Physicians &*

In their petition for writ of mandate and complaint for declaratory relief (actually appended to the School Districts' petition and complaint), the community college districts (comprising San Mateo, Santa Monica, State Center, and El Camino; hereafter collectively, College Districts) allege that the Health Fee Rule constitutes an invalid, unenforceable underground regulation under the APA as applied by the Controller in auditing reimbursement claims for the Health Fee Elimination Program or, alternatively, that the Controller's auditing actions in this respect were beyond its lawful authority.

■ The basic legal principles that apply to these allegations are as follows: " 'If a rule constitutes a "regulation" within the meaning of the APA (other than an "emergency regulation" . . .) it may not be adopted, amended, or repealed except in conformity with "basic minimum procedural requirements," ' " which include public notice, opportunity for comment, agency response to comment, and review by the state Office of Administrative Law. (*Morning Star Co. v. State Bd. of Equalization* (2006) 38 Cal.4th 324, 333 [42 Cal.Rptr.3d 47, 132 P.3d 249] (*Morning Star*).) "These requirements promote the APA's goals of bureaucratic responsiveness and public engagement in agency rulemaking." (*Ibid.*)

Any regulation " 'that substantially fails to comply with these requirements may be judicially declared invalid' " and is deemed unenforceable. (*Morning Star, supra*, 38 Cal.4th at p. 333; see § 11350, subd. (a).)

A "regulation" under the APA "means every rule, regulation, order, or standard of general application or the amendment, supplement, or revision of any rule, regulation, order, or standard adopted by any state agency to implement, interpret, or make specific the law enforced or administered by it, or to govern its procedure." (§ 11342.600.) As we will later explain more fully, an APA regulation has two principal characteristics: It must apply generally; and it must implement, interpret, or make specific the law enforced or administered by the agency, or govern the agency's procedure. (*Morning Star, supra*, 38 Cal.4th at pp. 333–334; *Tidewater, supra*, 14 Cal.4th at p. 571.)

---

*Dentists v. Kizer* (1990) 223 Cal.App.3d 490, 504, fn. 5 [272 Cal.Rptr. 886].) San Juan Unified School District filed its petition and complaint on March 2, 2007. The rest of the School Districts, together, filed their petition and complaint on May 23, 2006. The trial court consolidated these two petitions and complaints on March 27, 2007.

The School Districts made challenges to other programs as well, but these challenges are not at issue on appeal.

### III. The CSDR as Applied to the SDC, EPEPD, Intradistrict Attendance, and Collective Bargaining Programs

We will start with the SDC Program. We do so because, of these four programs, the Commission's APA-valid, pre-May 27, 2004 P&G's for the SDC Program most closely resemble the Controller's CSDR.[3] If we conclude, nevertheless, that the CSDR is an underground regulation that violates the APA in this context, we will have to conclude similarly for these three other programs. It is undisputed that the Controller's CSDR was not enacted in compliance with APA procedure.

As we shall explain, we conclude that the CSDR, as applied to the (pre-May 27, 2004) SDC Program, is an underground, unenforceable regulation under the APA. Accordingly, the CSDR is invalid as applied to the School Districts' SDC Programs for the applicable periods roughly encompassing the fiscal years 1998 to 2003 (see fn. 2, *ante*), and invalid in parallel fashion to the three other programs as well.

The Commission determined, in the mid-1990's, that the SDC Program imposed a reimbursable state-mandated program on school districts by establishing the right of parents/guardians of students who were prohibited from transferring to another school district to appeal to the county board of education. (See Ed. Code, former § 48209.9, inoperative July 1, 2003.)

From August 24, 1995, until May 27, 2004, the Commission's P&G's for the SDC Program set forth the following two requirements for school districts seeking SDC Program state-mandated reimbursement for employee salary and benefit costs: (1) "Identify the employee(s) and their job classification, describe the mandated functions performed and specify the actual number of hours devoted to each function, the productive hourly rate and the related benefits. The average number of hours devoted to each function may be claimed if supported by a documented time study"; and (2) "For auditing purposes, all costs claimed must be traceable to source documents (e.g., employee time records, invoices, receipts, purchase orders, contracts, etc.) and/or worksheets that show evidence of and the validity of such claimed costs."

The Commission's SDC Program P&G's divide the subject of reimbursable costs into three categories: employee salaries and benefits; materials and supplies; and contracted services. The examples set forth in these P&G's for

---

[3] On May 27, 2004, the Commission validly amended its SDC Program P&G's to adopt this CSDR language.

"source documents" align with these three categories: "employee time records" for employee salaries and benefits; "invoices," "receipts" and "purchase orders" for materials and supplies; and "contracts" for contracted services. At issue in this appeal for the SDC, EPEPD, Intradistrict Attendance, and Collective Bargaining Programs are just the cost category of employee salaries and benefits.

From the initial issuance of the Commission's SDC Program P&G's in 1995 until May 27, 2004, the Controller's SDC-Program-specific Claiming Instructions substantively aligned with the SDC Program P&G's.

However, in September 2003, the Controller revised its general Claiming Instructions (that apply to state-mandated reimbursement claims in general) to set forth, for the first time, what has become known as the CSDR. The CSDR states:

"To be eligible for mandated cost reimbursement for any fiscal year, only actual costs may be claimed. Actual costs are those costs actually incurred to implement the mandated activities. Actual costs must be traceable and supported by source documents that show the validity of such costs, when they were incurred, and their relationship to the reimbursable activities. A source document is a document created at or near the same time the actual cost was incurred for the event or activity in question. Source documents may include, but are not limited to, employee time records or time logs, sign-in sheets, invoices, and receipts.

"Evidence corroborating the source documents may include, but is not limited to, worksheets, cost allocation reports (system generated), purchase orders, contracts, agendas, training packets, and declarations. Declarations must include a certification or declaration stating, 'I certify under penalty of perjury under the laws of the State of California that the foregoing is true and correct based upon personal knowledge.' Evidence corroborating the source documents may include data relevant to the reimbursable activities otherwise in compliance with local, state, and federal government requirements. However, corroborating documents cannot be substituted for source documents."

Substantial evidence showed that prior to the use of the CSDR in Controller audits, school districts obtained SDC Program state-mandated reimbursement for employee salary and benefit costs based on (1) declarations and certifications from the employees that set forth, after the fact, the time they had spent on SDC-Program-mandated tasks; or (2) an annual accounting of time determined by the number of mandated activities and the average time for each activity. After the Controller began using the CSDR in its auditing of SDC Program reimbursement claims, the Controller deemed these declarations, certifications, and accounting methods insufficient, and reduced the

reimbursement claims accordingly. (Substantial evidence also showed that the Controller, in 2000, began applying a CSDR requirement in field audits of SDC Program reimbursement claims, before the CSDR was expressed in the Controller's general Claiming Instructions in Sept. 2003 or adopted in the Commission's SDC Program P&G's on May 27, 2004.)

The question is whether the Controller's CSDR constituted an underground, unenforceable regulation that the Controller used in auditing the School Districts' SDC Programs for the fiscal years 1998 to 2003, because the CSDR constituted a state agency regulation that was not adopted in conformance with the APA prior to its valid adoption in the Commission's SDC Program P&G's on May 27, 2004. We answer this question "yes."

■ " '*A regulation subject to the APA . . .* has *two principal identifying characteristics.* [Citation.] *First,* the agency must intend its rule to apply generally, rather than in a specific case. The rule need not, however, apply universally; a rule applies generally so long as it declares how a certain class of cases will be decided. [Citation.] *Second,* the rule must "implement, interpret, or make specific the law enforced or administered by [the agency], or . . . govern [the agency's] procedure." ' " (*Morning Star, supra,* 38 Cal.4th at pp. 333–334, italics added, quoting *Tidewater, supra,* 14 Cal.4th at p. 571.)

As to the first criterion—whether the rule is intended to apply generally— substantial evidence supports the trial court's finding that the CSDR was "applie[d] generally to the auditing of reimbursement claims . . . ; the Controller's auditors ha[d] no discretion to judge on a case[-]by[-]case basis whether to apply the rule." (The trial court made this finding in the context of ruling on the Intradistrict Attendance and Collective Bargaining Programs, but this finding is a general one that applies equally to the SDC Program. The trial court did not apply this general finding to the SDC Program only because the court reasoned that the CSDR was not an APA-violative underground regulation in the SDC Program context, as the Commission later adopted the CSDR into its SDC Program P&G's (see fn. 3, *ante*). As we shall explain later, we reject this reasoning involving subsequent adoption.)

The CSDR also meets the second criterion of being a regulation: It implements, interprets, or makes specific the law enforced or administered by the Controller. The Controller argues, to the contrary, that the CSDR "merely restates" the source document requirement found in the pre-May 27, 2004 Commission P&G's for the SDC Program, and that "source documents" are, by their sourceful nature, contemporaneous. As we explain, we reject this argument.

Admittedly, the pre-May 27, 2004 SDC Program P&G's stated that, "[f]or auditing purposes, all costs claimed must be traceable to source documents

(e.g., employee time records, invoices, receipts, purchase orders, contracts, etc.) and/or worksheets that show evidence of and the validity of such claimed costs." However, the Controller's CSDR, in contrast to these P&G's, did not equate "source documents" with "worksheets," but relegated "worksheets" to the second-class status of "corroborating documents" that can only serve as evidence that corroborates "source documents." This is no small matter either. This is because, prior to the Controller using the CSDR to audit reimbursement claims, the School Districts, in making these claims, had used employee declarations and certifications and average time accountings to document the employee time spent on SDC-Program-mandated activities, and such methods can be deemed akin to worksheets.

More significantly, the CSDR expressly states that employee declarations and certifications are only corroborating documents, *not* source documents; the pre-May 27, 2004 SDC Program P&G's had nothing to say on this subject. In effect, then, the CSDR bars the use of employee time declarations and certifications as source documents or source document equivalent worksheets, in contrast to the pre-May 27, 2004 P&G's.

Along similar lines, the pre-May 27, 2004 SDC Program P&G's also stated that the "average number of [employee] hours devoted to each [mandated] function may be claimed if supported by a documented time study"; the record showed that such a time study is a documented estimate. The CSDR, which recognizes only actual costs traceable and supported by contemporaneous source documents, does not countenance such estimation.

Nor may the Controller point to the examples of the source documents listed in the pre-May 27, 2004 SDC Program P&G's and argue they show the contemporaneous nature of source documents: "employee time records, invoices, receipts, purchase orders, contracts, etc." First, this argument ignores the source document equivalent of "worksheets" set forth in these P&G's, as discussed above. And, second, while the CSDR lists "employee time records," "invoices," and "receipts" as source documents, it specifies that "purchase orders," "contracts" (and "worksheets") are only corroborating documents, not source documents.

Finally, the School Districts that had used employee declarations and certifications and average time accountings to document time for reimbursement claims also note that it is *now* physically impossible to comply with the CSDR's requirement of contemporaneousness that "[a] source document is a

document *created at or near the same time the actual cost was incurred* for the event or activity in question."[4] (Italics added.)

■ Given these substantive differences between the Commission's pre-May 27, 2004 SDC Program P&G's and the Controller's CSDR, we conclude that the CSDR implemented, interpreted or made specific the following laws enforced or administered by the Controller: the Commission's pre-May 27, 2004 P&G's for the SDC Program (§ 17558 [the Commission submits regulatory P&G's to the Controller, who in turn issues nonregulatory Claiming Instructions based thereon]); and the Controller's statutory authority to audit state-mandated reimbursement claims (§ 17561, subd. (d)(2)).

Consequently, the CSDR meets the two criteria for being an APA regulation. And because the CSDR, as applied to the SDC Program, was not adopted as a regulation in compliance with the APA rulemaking procedures until its May 27, 2004 incorporation into the SDC Program P&G's, this CSDR is an underground and unenforceable regulation as applied to the audits of the School Districts' SDC Programs for the applicable periods roughly encompassing the fiscal years 1998 to 2003. (See fn. 2, *ante.*) These audits are invalidated to the extent they used this CSDR.

As we noted at the outset of this part of the opinion, if we were to conclude (as we now have done) that the CSDR is an underground regulation that violates the APA in the SDC Program context presented here, we would have to conclude similarly for the EPEPD, Intradistrict Attendance, and Collective Bargaining Programs too. This is because the Commission's P&G's for these latter three programs less resembled the Controller's CSDR than did the Commission's pre-May 27, 2004 P&G's for the SDC Program. We now turn to the EPEPD, Intradistrict Attendance, and Collective Bargaining Programs, which we will describe briefly in order.

The EPEPD Program was found to be a reimbursable state-mandated program in 1987. This program requires school districts to establish earthquake procedures for each of their school buildings, and to allow use of their buildings, grounds and equipment for mass care and welfare shelters during public disasters or emergencies. (Ed. Code, former §§ 35925–35927, 40041.5, 40042.)

---

[4] As a related aside, it is interesting to note that the Controller's SDC-Program-specific Claiming Instructions that were in place during the pre-2004 P&G's stated that, "[f]or audit purposes, all supporting documents must be retained.[by claimant] [only] for a period of two years after the end of the calendar year in which the reimbursement claim was filed or last amended, whichever is later"; but the Controller had three years in which to conduct a reimbursement audit "after the date that the actual reimbursement claim is filed or last amended, whichever is later." (§ 17558.5, subd. (a).)

From 1991 until June 2, 2003, the Commission's P&G's for the EPEPD Program required school districts seeking state-mandated reimbursement for employee salary and benefit costs: (1) to "provide a listing of each employee . . . and the number of hours devoted to their [mandated] function"; and (2) "[f]or auditing purposes, all costs claimed may be traceable to source documents and/or worksheets that show evidence of the validity of such costs." The Controller's EPEPD-Program-specific Claiming Instructions, since 1996, have stated that "Source documents required to be maintained by the [reimbursement] claimant may include, but are not limited to, employee time cards and/or cost allocation reports." (The Commission, in like fashion to what it did with the SDC Program, incorporated the CSDR into its P&G's for the EPEPD Program, effective June 2, 2003.)

These pre-June 2, 2003 P&G's for the EPEPD Program parallel the pre-May 27, 2004 P&G's for the SDC Program, but even less resemble the Controller's CSDR than did those SDC Program P&G's. For the reasons set forth above involving the SDC Program, then, we conclude that the Controller's CSDR is an underground, unenforceable regulation as applied to the audits of the School Districts' EPEPD Programs for the applicable periods roughly encompassing the fiscal years 1998 to 2003. (See fn. 2, *ante*.) These audits are invalidated to the extent they used this CSDR.

The Intradistrict Attendance Program, in 1995, was found to be a reimbursable state-mandated program. This program establishes a policy of open enrollment within a school district for district residents. (Ed. Code, former § 35160.5.)

Since 1995, the Commission's P&G's for the Intradistrict Attendance Program have required school districts seeking state-mandated reimbursement for employee salary and benefit costs (1) to "[i]dentify the employee(s) and their job classification . . . and specify the actual number of hours devoted to each [mandated] function . . . . The average number of hours devoted to each function may be claimed if supported by a documented time study"; and (2) "[f]or auditing purposes, all costs claimed must be traceable to source documents and/or worksheets that show evidence of the validity of such costs." For the 1998 to 2003 period of fiscal years at issue, the Controller's Intradistrict Attendance Program-specific Claiming Instructions substantively mirrored P&G's for (1) above (except for the "average number of hours" provision), and stated as to source documents: "Source documents required to be maintained by the claimant may include, but are not limited to, employee time records that show the employee's actual time spent on this mandate." (In early 2010, the Commission incorporated the Controller's CSDR into the Intradistrict Attendance Program P&G's; see fn. 5, *post*.)

Applying the same reasoning we have applied above with respect to the SDC and the EPEPD Programs, we conclude that the Controller's CSDR is an underground, unenforceable regulation as applied to the audits of the School Districts' Intradistrict Attendance Programs for the applicable periods roughly encompassing the fiscal years 1998 to 2003. (See fn. 2, *ante*.) These audits are invalidated to the extent they used this CSDR.

That leaves the Collective Bargaining Program, which was found to be a reimbursable state-mandated program in 1978 (by the Commission's predecessor, the State Board of Control). This program requires school district employers to collectively bargain with represented employees, and to publicly disclose the major provisions of their agreements prior to final adoption. (§ 3540 et seq.)

If the Commission's pre-May 27, 2004 P&G's for the SDC Program most closely resemble the Controller's CSDR, the P&G's for the Collective Bargaining Program bear the least resemblance. As pertinent, the Collective Bargaining Program P&G's require school districts seeking reimbursement for employee salary and benefit costs to simply "[s]upply workload data requested . . . to support the level of costs claimed" and "[s]how the classification of the employees involved, amount of time spent, and their hourly rate"; nothing is said about "source documents." The Controller's Collective Bargaining Program-specific Claiming Instructions substantively mirror those of the Intradistrict Attendance Program, stating that source documents include employee time records that show the employee's actual time spent on the mandated function. (And as with the Intradistrict Attendance Program, the Commission, in early 2010, incorporated the Controller's CSDR into the Collective Bargaining Program P&G's; see fn. 5, *post*.)

Consequently, employing the same reasoning we have employed above, we conclude that the Controller's CSDR is an underground, unenforceable regulation as applied to the audits of the School Districts' Collective Bargaining Programs for the applicable periods roughly encompassing the fiscal years 1998 to 2003. (See fn. 2, *ante*.) These audits are invalidated to the extent they used this CSDR.

## IV. . Declaratory and Related Writ of Mandate Relief

The trial court declared that the Controller's CSDR, as applied to the audits of the Intradistrict Attendance and Collective Bargaining Programs for the 1998 to 2003 period of fiscal years, was an invalid and void underground regulation under the APA. Correspondingly, the trial court issued a peremptory writ of mandate (traditional mandamus) invalidating these CSDR-based audits to the extent they were not final audit determinations for more than

three years before the School Districts filed their respective lawsuits on May 23, 2006 (Clovis et al.) and March 2, 2007 (San Juan). This three-year period is the applicable three-year statute of limitations under Code of Civil Procedure section 338, subdivision (a), for enforcing a statutory liability like state-mandated reimbursement. We are affirming this part of the trial court's judgment.

However, the trial court refused to provide, in parallel fashion, declaratory and writ of mandate relief for the CSDR-based audits involving the SDC and EPEPD Programs. The School Districts contend the trial court erred in this respect. We agree.

In refusing to provide this relief, the trial court reasoned that, since the Commission had incorporated the Controller's CSDR into the Commission's regulatory P&G's for the SDC and EPEPD Programs, there was no longer an actual and ongoing controversy upon which to grant declaratory and related mandate relief concerning the CSDR's invalidity as an underground regulation in this context; and the Commission could administratively determine, pursuant to the Incorrect Reduction Claim process, the past audits that had used the CSDR before its incorporation into the SDC and EPEPD Programs' P&G's. This is where we part company with the trial court.

Our departure is based on section 11350 of the APA and the legal principles set forth in *Californians for Native Salmon etc. Assn. v. Department of Forestry* (1990) 221 Cal.App.3d 1419 [271 Cal.Rptr. 270] (*Native Salmon*) and its progeny.

Section 11350 of the APA specifies that "[a]ny interested person may obtain a judicial declaration as to the validity of any regulation . . . by bringing an action for declaratory relief . . . ." (§ 11350, subd. (a).)

In *Native Salmon*, the plaintiffs sought declaratory relief against the state forestry department, alleging that it was department policy, with respect to timber harvest plans (1) to delay responses to public comments, and (2) to not evaluate the cumulative impact of logging activities in the plans. The *Native Salmon* court concluded that declaratory relief was appropriate in this context, stating: "[Plaintiffs] . . . challenge not a specific [administrative] order or decision [which is generally subject to review only pursuant to a writ of *administrative* mandate, rather than traditional mandate], or even a series thereof, but an overarching, quasi-legislative policy set by an administrative agency. Such a policy is subject to review in an action for declaratory relief. . . . [¶] . . . [R]eview of specific, discretionary administrative decisions [must not be confused] with review of a generalized agency policy. Declaratory relief directed to *policies* of administrative agencies is not an unwarranted control of discretionary, specific agency decisions." (*Native Salmon,*

*supra*, 221 Cal.App.3d at p. 1429, citations omitted; accord, *Venice Town Council, Inc. v. City of Los Angeles* (1996) 47 Cal.App.4th 1547, 1566 [55 Cal.Rptr.2d 465]; see also *Simi Valley Adventist Hospital v. Bonta´* (2000) 81 Cal.App.4th 346, 354–355.)

Similarly, here, the School Districts have challenged "an overarching, quasi-legislative policy set by an administrative agency" (*Native Salmon, supra*, 221 Cal.App.3d at p. 1429) rather than a specific, discretionary administrative decision: i.e., the Controller's policy of using the (underground) CSDR to conduct audits in the SDC and EPEPD Programs for the period straddling the fiscal years 1998 to 2003. Declaratory and accompanying traditional mandate relief is appropriate in this context; this is an ongoing controversy limited by the three-year statute of limitations noted above.[5]

And there is no adequate administrative remedy. The trial court made a finding—supported by substantial evidence—that the Commission "consistently refuses to rule on underground regulation claims on the basis of an opinion that it lacks jurisdiction to decide such claims." (The trial court made this finding in discussing the Intradistrict Attendance and Collective Bargaining Programs, but the finding applies equally to the SDC and EPEPD Programs.)

We conclude that declaratory and accompanying traditional mandate relief applies not only to the Intradistrict Attendance and Collective Bargaining Programs, but also to the SDC and EPEPD Programs for the fiscal years at issue.[6]

---

[5] The Controller had requested that, at a minimum, we stay this appeal in light of the Commission's pending decision to incorporate the Controller's CSDR into the Commission's P&G's for the Intradistrict Attendance and Collective Bargaining Programs, as the Commission has done for the SDC and EPEPD Programs. In a subsequent request for judicial notice, the Controller has now noted that the Commission, on January 29, 2010, amended its P&G's for the Intradistrict Attendance and Collective Bargaining Programs to adopt the CSDR for each program. We deny this request for judicial notice. This is because the central issue in the present appeal concerns the Controller's policy of using the CSDR *during the 1998 to 2003 fiscal years*, when the CSDR was an underground regulation. This issue is not resolved by the Commission's *subsequent* incorporation of the CSDR into its Intradistrict Attendance and Collective Bargaining Programs' P&G's.

Also, we deny the School Districts' request for judicial notice of the Commission's Incorrect Reduction Claim caseload summary and the Controller's list of final audit reports for California school districts and community college districts.

[6] In light of our resolution, we need not consider the School Districts' alternative claim that the Controller's CSDR constitutes an unlawful retroactive rule, or the School Districts'

## V. Health Fee Elimination Program

In 1986, and again in 1989 (after statutory amendment), the Commission determined that the Health Fee Elimination Program imposed a reimbursable state-mandated cost on those community college districts that provide health services, by requiring those districts to maintain in the future the level of service they had provided in the 1986–1987 fiscal year (termed the "maintenance of effort" requirement); this "maintenance of effort" had to take place even if the districts, as they were and are permitted to do under the relevant statute, eliminated their nominal statutory student health fee ($7.50 per semester maximum (Ed. Code, former § 72246; Stats. 1984, 2d Ex. Sess. 1983–1984, ch. 1, §§ 4, 4.5, p. 6642); $10 per semester maximum (current Ed. Code, § 76355, subd. (a)(1)).[7]

The College Districts contend that the Controller's Claiming Instruction for the Health Fee Elimination Program is an underground regulation under the APA and beyond the Controller's authority. Specifically, the College Districts argue that the Controller's Health Fee Rule misapplies the Commission's Health Fee Elimination Program P&G's by automatically reducing reimbursement claims by the amount that districts are statutorily authorized to charge students for health fees, even when a district chooses not to charge its students those fees.

Since 1989, the Commission's Health Fee Elimination Program P&G's have stated in pertinent part: "Any offsetting savings the claimant experiences as a direct result of this statute [(i.e., the health fee statutes—formerly Ed. Code, § 72246; now Ed. Code, § 76355)] must be deducted from the [reimbursement] costs claimed. In addition, reimbursement for this mandate received from any source, e.g., federal, state, etc., shall be identified and deducted from this claim. This shall include the amount of $7.50 per full-time student per semester, $5.00 per full-time student for summer school, or $5.00 per full-time student per quarter, as authorized by Education Code section 72246[, subdivision] (a). This shall also include payments (fees) received from individuals other than students who are not covered by Education Code Section 72246 for health services."

---

additional claim that regardless whether an actual controversy exists for purposes of declaratory relief, the requested writ relief is not moot.

[7] As Education Code section 76355, subdivision (a)(1) states: "The governing board of a district maintaining a community college may require community college students to pay a fee in the total amount of not more than ten dollars ($10) for each semester, seven dollars ($7) for summer school, seven dollars ($7) for each intersession of at least four weeks, or seven dollars ($7) for each quarter for health supervision and services, including direct or indirect medical and hospitalization services, or the operation of a student health center or centers, or both." (An inflationary adjustment is provided for in subd. (a)(2) of § 76355.)

The Controller's Health Fee Rule (i.e., its Health Fee Elimination Program-specific Claiming Instruction) states in pertinent part: "Eligible claimants will be reimbursed for health service costs at the level of service provided in the 1986/87 fiscal year. The reimbursement will be reduced by the amount of student health fees authorized per the Education Code [section] 76355."

The College Districts maintain that the Controller's Health Fee Rule constitutes an invalid, underground regulation—i.e., one not adopted pursuant to the APA—because it meets the two-part test of a "regulation": (1) the Controller generally applies it; and (2) the rule implements, interprets or makes specific the Commission's Health Fee Elimination Program P&G's. (*Morning Star, supra,* 38 Cal.4th at pp. 333–334.)

There is no quibble with part (1)—general application. The real issue is with part (2) of the test—defining a "regulation" as implementing, interpreting, or making specific the Health Fee Elimination Program P&G's. The College Districts argue that those P&G's require that the mandate claimant have actually "experience[d]" or "received" an amount of health service money for that amount to be deducted from the reimbursement claim. That is, if a college district does not charge its students a health service fee, as the district is statutorily permitted to do, then the district has not "experienced" or "received" that fee, and that amount cannot be deducted. The College Districts note that the Health Fee Rule, by contrast, states flatly that "reimbursement will be reduced by the amount of student health fees authorized per the Education Code [section] 76355."

The College Districts' argument carries some weight, especially when viewed solely within the prism of comparing the Health Fee Elimination Program P&G's to the Health Fee Rule semantically. But the argument falters when exposed to the broader context of the nature of state-mandated costs and common sense.

As for the nature of state-mandated costs, section 17514 defines "costs mandated by the state" to mean "any *increased costs* which a local agency or school district is *required to incur* after July 1, 1980, as a result of any statute enacted on or after January 1, 1975, or any executive order implementing any statute enacted on or after January 1, 1975, which mandates a new program or higher level of service of an existing program within the meaning of Section 6 of Article XIII B of the California Constitution." (Italics added.) And section 17556 reflects this definition by stating that costs are not deemed mandated by the state to the extent the "local agency or school district *has the authority* to levy service charges, fees, or assessments sufficient to pay for the mandated program or increased level of service." (§ 17556, subd. (d), italics added.)

■  The College Districts point out, though, in a series of overlapping arguments, that sections 17514 and 17556 govern the *Commission's* determination of whether a program is a state-mandated program, not the *Controller's* determination as to audit reductions; and the Commission has already found the Health Fee Elimination Program to be a state-mandated program. This observation, however, does not diminish the basic principle underlying the state mandate process that sections 17514 and 17566, subdivision (d) embody: To the extent a local agency or school district "has the authority" to charge for the mandated program or increased level of service, that charge cannot be recovered as a state-mandated cost.[8] (See *Connell v. Superior Court* (1997) 59 Cal.App.4th 382, 401 [69 Cal.Rptr.2d 231] ["the plain language of [section 17556, subdivision (d)] precludes reimbursement where the local agency has the authority, i.e., the right or the power, to levy fees sufficient to cover the costs of the state-mandated program"]; see *Connell*, at pp. 397–398.)

And this basic principle flows from common sense as well. As the Controller succinctly puts it, "Claimants can choose not to require these fees, but not at the state's expense."

The College Districts also argue that the Controller lacks the authority to rely on these Government Code sections to uphold its Health Fee Rule. The argument is that, since the Health Fee Rule is a Claiming Instruction, its validity must be determined *solely* through the Commission's P&G's. To accept this argument, though, we would have to ignore, and so would the Controller, the fundamental legal principles underlying state-mandated costs. We conclude the Health Fee Rule is valid.

## DISPOSITION

We direct the trial court to issue a peremptory writ of mandate that invalidates the Controller's audits of the School Districts' SDC and EPEPD Programs reimbursement claims for the applicable periods identified in footnote 2, *ante*, encompassing the fiscal years 1998 to 2003, to the extent those audits were based on the CSDR and did not become final audit determinations prior to the applicable three-year statute of limitations. If it chooses to do so, the Controller may reaudit the relevant reimbursement claims based on the documentation requirements of the P&G's and Claiming

---

[8] In light of sections 17514 and 17556, subdivision (d), the Commission found the Health Fee Elimination Program to be a reimbursable state-mandated program to the extent the cost to community college districts of maintaining their level of health services at the 1986–1987 level, as required by the Health Fee Elimination Program mandate, is not covered by the nominal health fee authorized by section 76355, subdivision (a)(1) ($10 maximum per semester per student).

Instructions when the mandate costs were incurred (i.e., not using the CSDR). In all other respects, the judgment is affirmed.

The parties shall each bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(3).)

Scotland, P. J., and Nicholson, J., concurred.

A petition for a rehearing was denied October 14, 2010, and the opinion was modified to read as printed above.