Filed 2/18/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| GULF OFFSHORE LOGISTICS, LLC, et al., <br><br> Petitioners, <br><br> v. <br><br> THE SUPERIOR COURT OF VENTURA COUNTY, <br><br> Respondent; <br><br> CLAUDE NORRIS et al., <br><br> Real Parties in Interest. | 2d Civil No. B298318 <br> (Super. Ct. No. 56-2016-00484144-CU-OE-VTA) <br> (Ventura County) |

Non-California residents and former crew members of a vessel that provided maintenance services to oil platforms located in the Pacific Ocean off the California coast filed this action alleging violations of California state wage and hour laws against their employers and the owners of the vessel, petitioners Gulf Offshore Logistics, LLC and JNB Operating, LLC. Petitioners moved for summary judgment on the theories that Louisiana rather than California law governed the employment

relationships at issue, and that either the federal Fair Labor Standards Act (FLSA) or the dormant commerce clause preempted California law with respect to these employees. The superior court denied the motion because petitioners "have not demonstrated that Louisiana law should apply" or that California law has been preempted.

Petitioners sought writ of mandate directing the superior court to vacate its order denying the motion for summary judgment and to enter a new order granting the motion. We issued an order to show cause and temporarily stayed all trial court proceedings. We conclude the trial court erred because Louisiana law, rather than California law, applies. Accordingly, we grant the writ of mandate.

*Facts*

Petitioners own and operate the Adele Elise, a vessel that provides services to oil platforms located off the California coast. The crew members represent a class of persons who were employed by petitioners to work on the Adele Elise after July 14, 2012. They allege petitioners failed to comply with numerous provisions of California's wage and hour laws, including paying minimum wage, paying wages at the designated rate, paying overtime, providing meal and rest periods, maintaining adequate payroll records, providing accurate wage statements, and paying all wages due at termination.

Petitioners are limited liability companies formed under Louisiana law. Every member of both companies is also a Louisiana resident. The companies have their headquarters in Louisiana and the Adele Elise, the vessel on which crew members were employed, is registered in that state. Although the Adele Elise operated for a time in the Gulf of Mexico, it was

2

repositioned to the Pacific Ocean in March 2011 and remained there until October 2017.

Petitioners' administrative functions are performed at their headquarters in Louisiana. Each former crew member traveled to Louisiana to apply in person for a job and to interview for that job. They also completed and acknowledged receipt of employment-related documents in Louisiana including: the employment application; job description; employee safety manual; minimum training requirements; disembarkation policy; pre-employment checklist; permission to release payroll check; non-California state and federal tax forms; Department of Homeland Security forms and direct deposit authorizations. Petitioners conduct job training and orientation for employees in Louisiana. In addition, staff at petitioners' Louisiana offices make arrangements to transport the crew members to and from the vessels to which they are assigned.

The crew members worked on the Adele Elise from March 2011 when it was repositioned from the Gulf of Mexico to the Pacific Ocean. In October 2017, the vessel left California. Between 2011 and 2017, the Adele Elise was docked at Port Hueneme and provided services to oil platforms located in federal waters off the California coast. While stationed at Port Hueneme, the Adele Elise traveled through the Santa Barbara Channel to deliver supplies and pick up refuse from four oil platforms. Between July 2012 and May 2015, the Adele Elise made approximately three trips each week to the oil platforms. After an oil spill occurred in May 2015, the average number of weekly trips declined.

The crew members are a class that is represented by three named members: Claude Norris, Douglas Kwaw and James

3

Musgrove.  None of the named class representatives resides in or owns property in California.  Norris, a resident of Texas, was employed as an able-bodied seaman aboard the Adele Elise while it was stationed at Port Hueneme for 571.5 days from June 2013 to January 2016.  Norris was paid a flat daily rate for his services, ranging from $140 to $350 per day.  Kwaw, a resident of Ohio, was employed as an able-bodied seaman aboard the Adele Elise while it was stationed at Port Hueneme for 580.5 days between July 2013 and August 2015.  He was paid a flat daily rate for his services, ranging between $265 to $350 per day.  Musgrove, a resident of Mississippi, was employed as an engineer aboard the Adele Elise while it was stationed at Port Hueneme for 471.5 days between August 2013 and February 2016.  He was paid a flat daily rate for his services, ranging between $310 to $750 per day.  The employment of each class representative was terminated only because of a reduction in force.  The crew members' wage and hour claims were made after their employment was terminated.

The crew members who were employed as able bodied seamen typically worked a "hitch" of 42 days on and 21 days off.  Those employed as engineers worked 21 days on and 21 days off.  Each employee would travel by air from the airport closest to the crew member's home in Texas, Ohio, and Mississippi to Los Angeles, where they were shuttled to the vessel in Port Hueneme.  At the end of their hitch, the employees would be shuttled back to the Los Angeles airport and flown back to their home states.  Administrative employees of petitioners, who were located in Louisiana, made travel arrangements for the crew members.

Once they arrived at the vessel, the crew members were not permitted to leave the vessel without permission for the remainder of their hitch.  Occasionally, they were asked to disembark when the vessel was in port, to run errands or pick up supplies.  They worked at least 12 hours per day each day of their hitch.  The job duties of crew members who were employed as deckhands and able-bodied seamen included handling tow and mooring lines, securing the vessel to docks and wharves, assisting in loading and unloading supplies, equipment and cargo, assisting with pumping water and fuel, cleaning the vessel and lifeboats, standing lookout, food preparation and cleaning the galley, repairing machinery and equipment, and performing other maintenance tasks such as painting, sanding, chipping and scraping the vessel.

Other crew members were employed as engineers.  These employees' job duties included general engine maintenance, changing the engine oil, servicing the engine, pumping mud and chemicals off the vessel on the platforms, receiving fuel for the vessel and fueling the vessel on the platforms.

While stationed at Port Hueneme, the Adele Elise would travel through the Santa Barbara Channel to deliver supplies to, and pick up refuse from four oil platforms.  The vessel left from, and returned to the same port; it did not travel to other states.

Travel time from port to the first platform was approximately 7 hours.  After servicing the first platform, the vessel would travel to the second, third and fourth platforms and then back to Port Hueneme.  The journey from the fourth platform to Port Hueneme typically took about 8 hours.  The entire round trip lasted about 24 hours.

The port of Port Hueneme is located within the State of California while the oil platforms are located outside the state. On its route to and from the platforms, the Adele Elise sailed both inside and outside of California's state boundaries. The parties dispute how much time the Adele Elise spent outside the state. It is undisputed, however, that between March 2011 and October 2017, the Adele Elise docked exclusively at Port Hueneme, California.

*Discussion*

*Conflict of Laws*

Petitioners contend summary judgment should have been granted because Louisiana, rather than California law, governs their employment relationship with the crew members. The crew members contend California law governs because they performed most of their work within the State of California. We agree with petitioners.

As our Supreme Court explained in *Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557 (*Tidewater*), federal law defines California's territorial boundaries more narrowly than does California state law. Under California's state law definition of its own boundaries, "the entire Santa Barbara Channel is within the state." (*Id.* at p. 564.) Under federal law, "the central portion of the Santa Barbara Channel is not within the state." (*Ibid.*) "In defining California's federal law boundaries, Congress did not, however, suggest that California lacked power to regulate conduct outside those boundaries and within broader state law boundaries." (*Ibid.*) To the contrary, "California employment laws implicitly extend to employment occurring within California's *state law* boundaries, including all of the Santa Barbara Channel," unless "the operation of federal

6

law were at issue, as for example if federal law conflicted with state law." (*Id* at p. 565.)

To determine whether California law conflicts with Louisiana law, we apply a governmental interest analysis. (*Sullivan v. Oracle Corp.* (2011) 51 Cal.4th 1191, 1202 (*Sullivan*).) "'First, the court determines whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different. Second, if there is a difference, the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists. Third, if the court finds that there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law "to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state" [citation], and then ultimately applies "the law of the state whose interest would be the more impaired if its law were not applied."' [Citations.]" (*Id.* at pp. 1202–1203. See also *Chen v. Los Angeles Truck Centers, LLC* (2019) 7 Cal.5th 862, 867-868.)

First, California law differs from Louisiana law. California requires the payment of overtime compensation at a rate based on the number of hours worked, consecutive days worked and the employee's regular hourly wage. (Lab. Code, § 510, subd. (a).) "The right to overtime under California law is unaffected by contract. [Citations.]" (*Sullivan*, *supra*, 51 Cal.4th at p. 1202.) California also requires that employees receive meal and rest periods (Lab. Code, § 512, subd. (a)), and itemized wage statements. (Lab. Code, § 226.) Louisiana has no specific laws addressing overtime compensation or other similar terms of

7

employment, relying instead on the FLSA and federal maritime law. The FLSA exempts seamen, like real parties, from overtime compensation. (29 U.S.C. § 213(b)(6).)

Second, after considering "'each jurisdiction's interest in the application of its own law under the circumstances of the particular case,'" we conclude that a "true conflict exists" between the two regulatory schemes. (*Sullivan*, *supra*, 51 Cal.4th at p. 1202.) California has an interest in "applying its overtime law to all nonexempt workers, and all work performed, within its borders. [Citations.] California's interests, as this court has identified them, are in protecting health and safety, expanding the labor market, and preventing the evils associated with overwork." (*Id.* at pp. 1203-1204.) Louisiana defers to the federal FLSA, which similarly promotes the federal government's interest in maintaining "the minimum standard of living necessary for health, efficiency and general well-being of workers . . . ." (29 U.S.C. § 202(a); *Barrentine v. Arkansas-Best Freight System, Inc.* (1981) 450 U.S. 728, 739.) Unlike California's Labor Code, however, the FLSA expressly exempts from its provisions, "any employee employed as a seaman." (29 U.S.C. § 213(b)(6).)

In both *Sullivan* and *Tidewater*, our Supreme Court held there was no "true conflict" between California's overtime law and a state or federal law that left overtime unregulated. In each of those cases, however, the employees performed work inside California and either resided here (*Tidewater*) or worked for a California employer and periodically came into this state to perform work. (*Sullivan*.) Here, the employees reside outside the State and work for Louisiana-based employers. Although they perform some of their work inside California's territorial waters,

8

they have no other significant contact with the State. In addition, their employment relationships were formed in Louisiana and all management and administrative functions are performed there. Under the circumstances of this particular case, we conclude *Sullivan* and *Tidewater* are distinguishable and that a "true conflict" exists between California and Louisiana law.

*Sullivan* and *Tidewater* establish that California has strong interests in regulating the working conditions of non-residents who work for California employers within the State's territorial boundaries (*Sullivan*), and of residents who work both within and outside those boundaries. (*Tidwater*.) As the court explained in *Tidewater*, "If an employee resides in California, receives pay in California, and works exclusively, or principally, in California, then that employee is a 'wage earner of California' and presumptively enjoys the protection of [California law]." (*Tidewater*, *supra*, 14 Cal.4th at p. 578.)

Here, however, the crew members are not residents of California and they perform work both within the boundaries of the State and outside those boundaries. Unlike the employees at issue in either *Sullivan* or *Tidewater*, the crew members do not leave the vessel, even when it is docked at a California port, except under very limited circumstances. They have no significant interaction with the State of California even as they perform work on a vessel that is docked or sailing within the state's territorial boundaries. After finishing their "hitch," the crew members almost immediately leave the state, again without interacting in any meaningful way with its residents, economy, or civic life.

9

While the work performed by the crew members was performed within the territorial boundaries of California, it was performed on a boat at sea. Every other aspect of their employment relationship with petitioners occurred in Louisiana. Petitioners' headquarters are located in Louisiana. The crew members traveled to Louisiana to apply for their jobs, to execute numerous employment-related documents and to attend training and orientation. From their offices in Louisiana, petitioners made arrangements for the crew members to travel between their respective homes and the vessel in California. Other administrative functions, including payroll and benefits, were also performed in Louisiana.

In these circumstances, we conclude Louisiana's interest in the application of its laws is stronger than California's. The employment relationships here were formed in Louisiana, between Louisiana-based employers and non-resident employees who traveled to that state to apply for, and accept employment. They received training and orientation in Louisiana and the administrative aspects of their employment were performed in that state. California's interests are weaker because, although the crew members performed some of their work in this state, neither the employees nor the employers are residents or taxpayers of this state.

As a consequence, we conclude Louisiana law governs the employment relationship at issue here, rather than California law. The trial court erred in concluding petitioners failed to demonstrate that Louisiana law should apply.

10

*Preemption*

Petitioners urge us to conclude in addition that the federal FLSA preempts California's wage and hour regulations with respect to the crew members. Because we conclude that California law does not apply to the crew members, we need not reach the question of whether California law is also preempted by the federal statute. But we note that our Supreme Court has held that the FLSA did not preempt California's state regulation of seamen's overtime pay. (*Tidewater*, *supra*, 14 Cal.4th at pp. 567-568 ["we find no evidence that Congress intended the FLSA's seamen exemption to preempt state law"].) We are bound by our Supreme Court's holding on this issue. (*Auto Equity Sales*, *Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455-456.)

*Disposition*

The petition for writ of mandate is granted. The trial court is ordered to vacate its order of May 23, 2019 denying the motion for summary judgment and to enter a new order granting summary judgment. The order to show cause is discharged and the stay heretofore issued is dissolved. Petitioners shall recover their costs.

CERTIFIED FOR PUBLICATION.


YEGAN, Acting P. J.

We concur:


PERREN, J.          TANGEMAN, J.

11

Vincent J. O'Neil, Jr., Judge

Superior Court County of Ventura

_____

Akin Gump Strauss Hauer & Feld and Gregory W. Knopp; Phelps Dunbar and Jolee Land; and David M. Korn for Petitioners.

No appearance for Respondent.

Rothschild & Alwill and Kristi D. Rothschild for Real Parties in Interest.